# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before the Court Sitting En Banc[1]

**UNITED STATES, Appellee**
**v.**
**Master Sergeant TIMOTHY B. HENNIS,**
**United States Army, Appellant**

ARMY 20100304

Headquarters, XVIII Airborne Corps and Fort Bragg
Patrick J. Parrish, Military Judge
Colonel Thomas E. Ayres, Staff Judge Advocate (pretrial)
Colonel Lorianne M. Campanella, Acting Staff Judge Advocate (recommendation)
Colonel Paul S. Wilson, Staff Judge Advocate (addendum)

For Appellant: Lieutenant Colonel Jonathan F. Potter, JA; Captain Ryan T. Yoder, JA (argued)[2]; Lieutenant Colonel Jonathan F. Potter, JA; Captain Michael J. Millios, JA (on brief); Lieutenant Colonel Jonathan F. Potter, JA; Captain Ryan T. Yoder, JA (on brief in response to specified issues and on reply brief in response to specified issues); Lieutenant Colonel Jonathan F. Potter, JA; Captain Ryan T. Yoder, JA (on reply brief).

For Appellee: Captain Jihan Walker, JA; Captain Carling M. Dunham, JA (argued); Major A.G. Courie III, JA; Major Janae M. Lepir, JA; Captain Carrie L. Ward, JA (on brief); Colonel Mark H. Sydenham, JA; Major A.G. Courie, III, JA; Captain Jihan Walker, JA (on brief in response to specified issues).

6 October 2016

---------------------------------
OPINION OF THE COURT
---------------------------------

PENLAND, Judge:

---

[1] Chief Judge RISCH, Senior Judge MULLIGAN, Senior Judge CAMPANELLA, Judge FEBBO, Judge CELTNIEKS, and Judge WOLFE are taking no part in this case as a result of their disqualifications.

[2] The court heard oral argument on 5 May 2016. At that time, Chief Judge WILSON and Senior Judge HAIGHT were members of this court; however, they took no part in this case as a result of their disqualifications.

A general court-martial with enlisted representation found appellant guilty, contrary to his pleas, of three specifications of premeditated murder, in violation of Article 118, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 918 (1956). The panel sentenced appellant to death, a dishonorable discharge, forfeiture of all pay and allowances, and reduction to E-1. We review this case under Article 66, UCMJ.

Appellant has assigned forty-nine errors, some of which we discuss in detail, none of which merit relief. We have also reviewed the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and they are without merit. We specified and discuss three additional issues, none of which merit relief.

## BACKGROUND

The case stems from a triple homicide in Fayetteville, North Carolina, occurring during the hours of darkness between 9 and 10 May 1985. The oldest victim, Mrs. KE, was married to Air Force Captain GE, who was assigned to nearby Pope Air Force Base, but, at the time of the murders, was away on temporary duty at Maxwell Air Force Base, Alabama. Their five-year-old daughter, Miss KE, and three-year-old daughter, Miss EE, were also murdered. Their sole surviving child, Miss JE, was left in her baby crib and discovered on 12 May 1985 by a law enforcement officer responding to a neighbor's report of hearing Miss JE's cries from within the house. Mrs. KE's body was partially naked and her wrists bore ligature marks; her underwear had been cut from her body and was discovered along with her jeans on the living room floor among other evidence of a struggle. All victims died from multiple stab wounds and cuts to their necks; Miss EE was nearly decapitated. The autopsy of Mrs. KE's body revealed multiple intact spermatozoa in her vagina.

A jury convicted appellant and sentenced him to death for the murders in a 1986 North Carolina state trial. On appeal, the Supreme Court of North Carolina ordered a new trial, concluding the prosecution had used excessively "gruesome" photos of the victims in obtaining the conviction. *State v. Hennis*, 323 N.C. 279, 372 S.E.2d 523 (1988). A jury acquitted appellant in his second state trial in 1989. Appellant resumed full active duty status, received service credit for his civilian confinement, and retired as a Master Sergeant (MSG) from the Regular Army in 2004.

Post-1989 advances in deoxyribonucleic acid (DNA) analysis enabled state and military law enforcement agencies to subsequently test the recovered spermatozoa for the presence of DNA. Multiple tests, results of which were ultimately admitted into evidence at appellant's court-martial, established the near-

statistical certainty that appellant produced the sperm recovered from Mrs. KE's body.

With this new discovery, the convening authority sent a 29 June 2006 memorandum to the Assistant Secretary of the Army (Manpower and Reserve Affairs) (ASA (M&RA)), requesting "approval to order [appellant] to active duty in order to facilitate courts-martial action." In response, the acting ASA (M&RA) issued a memorandum, with the subject "Involuntary Order to Active Duty." In pertinent part, it stated: "Under the provisions of Article 2(a)(4), Uniform Code of Military Justice, 10 U.S.C. § 688, and Army Regulation (AR) 27-10, [Legal Services: Military Justice] paragraph 5-2(b)(3), I hereby order Master Sergeant (Ret.) Timothy B. Hennis to active duty."

Implementing the ASA (M&RA)'s decision and order, the Army's Human Resources Command issued a 14 September 2006 order, noting appellant's retention on active duty and directing him to report to Headquarters, XVIII Airborne Corps, in October 2006. Appellant complied and remained on active duty with that unit through his court-martial.

## ASSIGNMENTS OF ERROR[3] AND SPECIFIED ISSUES

**I. WHETHER THE ARMY'S PROSECUTION OF MASTER SERGEANT HENNIS AT THE STATE OF NORTH CAROLINA'S REQUEST VIOLATES THE PROHIBITION AGAINST DOUBLE JEOPARDY AND THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT, WAS A SHAM ENGINEERED TO AVOID DOUBLE JEOPARDY, AND CONSTITUTED A VIOLATION OF POSSE COMITATUS.**

Appellant asserts Army officials "engineered" his court-martial as a "sham," prosecuting him on North Carolina's behalf and creating a subterfuge contrary to the Constitution's Double Jeopardy Clause. Our review of this case yields nothing to support appellant's argument, and we resolve the issue against him for the reason succinctly announced by our superior court in *United States v. Schneider*, 38 M.J. 387, 391-92 (C.M.A. 1993) ("The Double Jeopardy Clause does not bar one sovereign from proceeding on a charge of which an accused has been acquitted by another sovereign.") (citing *United States v. Wheeler*, 435 U.S. 313 (1978); *Bartkus v. Illinois*, 359 U.S. 121 (1959)).

---

[3] For clarity we adopt the assignment of error numbers appellant used in his brief.

Appellant also argues his court-martial violated the Posse Comitatus Act (PCA), 18 U.S.C. § 1385 (2000), which states:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

In *United States v. Thompson*, 33 M.J. 218, 220 (C.M.A. 1991), our superior court addressed the Department of Defense's (DoD) implementation of the PCA, which prohibited DoD law enforcement activities that were *primarily motivated* by a desire to assist civilian law enforcement agencies, while allowing DoD law enforcement activities "related to enforcement of the Uniform Code of Military Justice . . . ." (quoting 32 C.F.R. § 213.10(a)(2) (1982)). Appellant's argument lacks merit because, despite his claims to the contrary, this case involves no governmental subversion of the PCA, but rather a lawful exercise of authority pursuant to the UCMJ and federal law.

**II – A. WHETHER THE COURT-MARTIAL LACKED JURISDICTION TO TRY MASTER SERGEANT HENNIS FOR THE CHARGED OFFENSES BECAUSE HE WAS NOT LAWFULLY ORDERED TO ACTIVE DUTY, UNDER ARTICLE 2(A)(1), UCMJ, AND WHETHER, THEREFORE, PERSONAL JURISDICTION DID NOT ATTACH TO MASTER SERGEANT HENNIS' COURT-MARTIAL RENDERING THE COURT-MARTIAL VOID.**

To more fully consider this assigned error, we specified and received briefs regarding a closely-related issue of personal jurisdiction: whether the ASA (M&RA) possessed authority to order appellant to active duty under 10 U.S.C. § 688, where the Secretary of the Army did not personally issue said order. We took this approach considering the well-established principle that the lawfulness of an order depends on, *inter alia*, issuance by competent authority. *United States v. Kisala*, 64 M.J. 50, 52 (C.A.A.F. 2006).

This issue is the first of multiple jurisdictional disputes in this case, with enduring principles regarding the burden of proof and standard of review that transcend each. "When challenged, the Government must prove jurisdiction by a preponderance of evidence." *United States v. Morita*, 74 M.J. 116, 121 (C.A.A.F. 2015) (citing *United States v. Oliver*, 57 M.J. 170, 172 (C.A.A.F. 2002)). "When an accused contests personal jurisdiction on

4

appeal, we review that question of law de novo, accepting the military judge's findings of historical facts unless they are clearly erroneous or unsupported in the record." *United States v. Melanson*, 53 M.J. 1, 2 (C.A.A.F. 2000) (citing *United States v. Owens*, 51 M.J. 204, 209 (C.A.A.F. 1999)).

Before trial, appellant moved to dismiss for lack of jurisdiction, arguing he retired from the Army, entered a reserve component status, and was not lawfully called to active duty therefrom (App. Ex. VIII). On 28 April 2008, the military judge denied appellant's motion (App. Ex. LXIX) and found:

> 1. In June 2006 the General Court-Martial Convening authority submitted a request through the Criminal Law Division, Office of the Judge Advocate General, to the Office of the Assistant Secretary of the Army (Manpower and Reserve Affairs) IAW [in accordance with (IAW)] AR 27-10, Chapter 5, for the purpose of obtaining the approval to order the accused to active duty from his retirement status to face a potential court-martial. See [Appellate Exhibit] AE IX and its enclosures.

> 2. Shortly thereafter, the Acting [ASA (M&RA)] approved that request and ordered the accused to active duty. AE IX, encl. 2.

> 3. The Government has shown that it properly ordered the accused to active duty for the purpose of prosecuting him under the provisions of the [UCMJ].

> 4. Under the authority of Article 2, UCMJ, the accused, a retiree, is subject to the UCMJ and may be prosecuted for offenses committed while on active duty or in a retired status.

> 5. Accordingly, the motion to dismiss for loss of jurisdiction or, in the alternative, to dismiss because the Government failed to follow Army regulations in recalling the accused is DENIED.

Article 2(a)(1), UCMJ, which was in effect in May 1985, states "[t]he following persons are subject to this chapter: . . . other persons lawfully called or ordered into, or to duty in or for training in, the armed forces . . . ." While the UCMJ does not specify who may issue such an order, 10 U.S.C. § 688, assigns retiree recall authority to the service secretaries:

> (a) Authority. Under regulations prescribed by the Secretary of Defense, a member described in subsection (b) may be ordered to active duty by the Secretary of the military department concerned at any time.
>
> (b) Covered members. Except as provided in subsection (d), subsection (a) applies to the following members of the armed forces:
>
> (1) A retired member of the Regular Army, Regular Navy, Regular Air Force, or Regular Marine Corps.
>
> (2) A member of the Retired Reserve who was retired under section 1293, 3911, 3914, 6323, 8911, or 8914 of this title.
>
> (3) A member of the Fleet Reserve or Fleet Marine Corps Reserve.
>
> (c) Duties of member ordered to active duty. The Secretary concerned may, to the extent consistent with other provisions of law, assign a member ordered to active duty under this section to such duties as the Secretary considers necessary in the interests of national defense.

Not surprisingly, 10 U.S.C. § 3013, which vests in the Secretary of the Army a broad landscape of authorities and responsibilities, specifically authorizes the Secretary to delegate authorities to subordinate Army officials:

> The Secretary of the Army may assign such of his functions, powers, and duties as he considers appropriate to the Under Secretary of the Army and to the Assistant Secretaries of the Army. Officers of the Army shall, as directed by the Secretary, report on any matter to the Secretary, the Under Secretary, or any Assistant Secretary.

10 U.S.C. § 3013(f) (2000).

Subsection (g)(3) of the statute further authorizes the Secretary to "prescribe regulations to carry out his functions, powers, and duties . . . ."

With this framework of legal authorities, we address whether the ASA (M&RA) was empowered to order appellant's recall. Pursuant to *United States v. Paul*, 73 M.J. 274, 278 (C.A.A.F. 2014) and *United States v. Ayers*, 54 M.J. 85, 90

(C.A.A.F. 2000), we take judicial notice of Department of the Army General Order (DAGO) 2002-03, Assignment of Functions and Responsibilities Within Headquarters, Department of the Army, dated 9 July 2002 (rescinded by DAGO 2012-1, dated 11 June 2012). Signed by the Secretary of the Army and citing 10 U.S.C. § 3013 as authority, DAGO 2002-03 describes and assigns, *inter alia*, functions to the ASA (M&RA):

> The [ASA (M&RA)] has the principal responsibility for setting the strategic direction and providing the overall supervision for manpower, personnel, and Reserve affairs across all the Army components (Active, Guard, Reserve, civilian and contractor). Among the responsibilities of the ASA (M&RA) are: . . . [o]verseeing the personnel security, corrections, discipline, Office of the Special Counsel investigations; law enforcement; and *military justice* matters in coordination with the Army General Counsel. (Emphasis added).

In identifying the potential impact of this order, appellant asserts it does not grant the ASA (M&RA) the required authority to recall appellant: "[DAGO 2002-03] did not delegate authority specifically over retirees. A retiree is not 'Active,' a member of the 'Guard' or 'Reserve,' and is not considered a 'civilian' or 'contractor.'" We disagree with appellant's narrow reading of the order. First, the order establishes the ASA (M&RA)'s responsibilities "across *all* the Army components," and we are unaware of any authority for appellant's tacit corollary that his retirement removed him completely therefrom. (Emphasis added). We conclude the opposite, noting his retirement order placed appellant in a control group administered by the reserve component. Second and finally, with his mandate to the ASA (M&RA) to oversee military justice matters, we conclude the Secretary enabled that assistant official to take all actions otherwise reserved to the Secretary under the UCMJ.

We also note the ASA (M&RA)'s citation to AR 27-10, para. 5-2(b)(3). This regulation was issued in 2005 "By Order of the Secretary of the Army," over the signature block of the Chief of Staff of the Army, and signed as "Official" by the Administrative Assistant to the Secretary of the Army. Paragraph 5-2(b)(3) states in pertinent part:

> If necessary to facilitate courts-martial action, retired soldiers may be ordered to active duty. Requests for active duty will be forwarded by electronic message through the Criminal Law Division, ATTN: DAJA-CL, Office of The Judge Advocate General, HQDA to the

7

> Office of the Assistant Secretary of the Army (Manpower and Reserve Affairs) for approval.

Appellant argues the passage's use of the word "approval" means something less than the ASA (M&RA)'s authority to actually order appellant to active duty. Instead, appellant argues the regulation gives the assistant secretary the authority to make a recall recommendation to the Secretary of the Army. As with DAGO 2002-03, we do not share this narrow view of the regulation. Considering the two documents together, we find the Secretary of the Army authorized the ASA (M&RA) to call retirees to active duty, therefore rendering him a competent authority to recall appellant under 10 U.S.C. § 688 and Article 2(a)(1), UCMJ.

Beyond his argument regarding the limits of DAGO 2002-03 and AR 27-10, appellant asserts his recall from retirement under 10 U.S.C. § 688 was defective as not "necessary in the interests of national defense." Congress empowered the Secretary of Defense to implement the statute, and appellant draws our attention to a contrast between previous DoD implementation guidance, which enumerated UCMJ proceedings as a permissible recall purpose, and its implementation guidance in effect at the time of appellant's recall, which is silent on the topic.[4]

Appellant argues this contrast evinces the judgment of the Secretary of Defense that UCMJ proceedings fall short in justifying a conclusion that such proceedings are "necessary in the interests of national defense." We disagree and instead find nothing in the DoD guidance which prevented the ASA (M&RA), acting as the designee of the Secretary of the Army, from recalling appellant to active duty in order to face court-martial charges. We find no arbitrariness or capriciousness as motivation for the ASA (M&RA)'s order as 10 U.S.C. § 688 provided an amply lawful purpose for appellant's recall.

Based on the foregoing, we conclude the government proved personal jurisdiction under Article 2(a)(1), UCMJ, by a preponderance of the evidence.

---

[4] *See* Dep't of Def. Dir. [hereinafter DOD Dir.] 1352.1, Management and Mobilization of Regular and Reserve Military Members (16 Jul. 2005) and DOD Dir. 1352.1 (2 Mar. 1990).

**II – B. WHETHER THE COURT-MARTIAL LACKED JURISDICTION TO TRY MASTER SERGEANT HENNIS FOR THE CHARGED OFFENSES BECAUSE OF HIS BREAK IN MILITARY SERVICE.**

On appeal, appellant again argues a break in service occurred between his 12 June 1989 discharge and 13 June 1989 reenlistment, depriving the court-martial of subject matter jurisdiction. The military judge denied appellant's similar motion to dismiss without specifically concluding whether a break in service occurred, but he wrote, "[a]ssuming *arguendo* there was a break in service based on the discharge certificate issued on 12 June 1989, Article 3(a), UCMJ, addresses the issue of revived jurisdiction as it applies to offenses committed prior to 1992." Reviewing the four statutory requirements, which we ultimately address below, the military judge ruled "if there was a break in service based on the discharge issued to the accused on 12 June 1989, jurisdiction is revived under Article 3(a), UCMJ."

Appellant initially enlisted in the Regular Army on 29 January 1981, agreeing to a four-year active duty commitment. On 1 February 1984, he extended his Regular Army enlistment obligation for one year in order to attend warrant officer training and flight school; 28 January 1986 became the new date for his expiration of term of service (ETS).

On 16 May 1985, appellant was arrested by civilian authorities for murder and rape, and remained in custody until 15 December 1985, when he was released on bail. In July 1986, appellant was convicted of murder and rape and sentenced to death in North Carolina state court. On 6 October 1988, the Supreme Court of North Carolina set aside his conviction and authorized a new trial. *Hennis*, 323 N.C. at 287, 372 S.E.2d at 528. His retrial ended in acquittal on 19 April 1989.

Appellant's civilian pretrial confinement and post-trial incarceration tolled the fulfillment of his enlistment obligation; and, after his acquittal he returned to duty at Fort Knox on 21 April 1989, where he was previously assigned to the installation's Personnel Control Facility (PCF) after his first civilian trial. On 22 May 1989, acting under AR 630-10 (Update 13, dated 16 March 1988), Absence Without Leave and Desertion, paragraph 1-8, appellant's commanding general approved the PCF commander's recommendation to "reclassify . . . as unavoidable" his absences from 16 May to 15 December 1985 (initial arrest until release on bail) and from 4 July 1986 to 19 April 1989 (post-trial incarceration until release on

acquittal).[5]  Under paragraph 1-8c, "[a] period of unauthorized absence that is excused as unavoidable will be creditable for all purposes."

On 1 June 1989, appellant requested to reenlist for four more years using Department of the Army (DA) Form 3340-R, Request for Regular Army Reenlistment or Extension.  Block 2c of this document contained 17 June 1989 as the date of his then-current ETS, apparently adjusted in response to his civilian confinement.  Block 2d reflects two enlistment extensions.  The first, effective 1 February 1984 for twelve additional months, corresponds with an extension document signed by appellant on that date.  The second extension, effective 6 January 1986 for seven additional months, has no corresponding extension request in the record of trial and was apparently made in response to the seven months appellant spent in civilian pretrial confinement.

On 12 June 1989, the Army honorably discharged appellant.  On 13 June 1989, using Department of Defense Form 4, Enlisted/Reenlistment Document, Armed Forces of the United States (which bore the typewritten words, "Immediate Reenlistment," in the top margin), appellant reenlisted for four more years.  Appellant remained on active duty in the Regular Army until his retirement on 31 July 2004.[6]

Before we can reasonably apply the law to this issue, we must accurately determine the necessary facts; and, to some extent, one of them is not self-evident.  This court "is required to conduct a de novo review of the entire record of trial." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).  Just before appellant reenlisted on 13 June 1989, what was his ETS date in light of the commanding general's 22 May 1989 decision?  One could perhaps conclude it was

---

[5] Paragraph 1-8b states, in pertinent part:  "[B]efore an unauthorized absence may be excused as unavoidable, the responsible commander must decide if the following occurred:  (1) The absence was not caused by the member's own misconduct.  (2) The member acted as prudently and responsibly as could be expected to avoid the absence.  (3) Representatives of the Army also acted as prudently and responsibly as could be expected to avoid the absence."

[6] Appellant later requested the Army Board for Correction of Military Records (ABCMR) correct certain aspects of his service record, and on 7 August 1991, the ABCMR decided to direct the following corrections:  showing his promotion to Staff Sergeant was effective 1 December 1988 with a date of rank of 4 November 1988; and, restoring an "appropriate amount of leave as determined by DFAS and by allowing a 3 year period in which to use the restored leave."  The ABCMR promulgated its decision on 19 August 1991.

17 June 1989, as the DA 3340-R showed, particularly where there is no evidence of appellant's disputing it when he requested to reenlist. Alternatively, the documented ETS date was simply incorrect, in light of the plain and, in our judgment, self-executing "creditable for all purposes" language in AR 630-10, paragraph 1-8b. We conclude the latter, for the first view would effectively enable a soldier and his chain of command to incorrectly establish a term of service inconsistent with controlling Army policy. For these reasons, we find that, immediately before the reenlistment in question, appellant's correct ETS date was—at the latest, applying both enlistment extensions—27 August 1986.

These facts lead us to examine the impact of our superior court's decisions and legislative changes to the UCMJ as they relate to two issues: whether appellant's military status was terminated before his June 1989 reenlistment, resulting in a break in service; and, if terminated, whether the Army lost authority to subject him to court-martial.

Considering appellant's ETS was 27 August 1986, our resolution of the first issue is partly informed by *United States ex rel. Hirshberg v. Cooke*, 336 U.S. 210 (1949), which held a servicemember's honorable discharge, followed the next day by reenlistment, divested the United States of court-martial jurisdiction for crimes committed during the previous enlistment period. However, we recognize our superior court's decision in *United States v. Clardy*, which distinguished *Hirshberg* and examined jurisdictional issues where a service member was prosecuted for offenses "committed shortly before [he] had been discharged from a prior enlistment for the purpose of immediate reenlistment and [that] were not in the category of offenses as to which military jurisdiction was preserved by Article 3(a), UCMJ." 13 M.J. 308, 309, 311 (C.M.A. 1982).

Focusing on whether Clardy had shed his military status, the majority quoted Colonel William Winthrop's, *Military Law and Precedents* (2d ed. 1920 reprint):

> [I]t is the opinion of the author that, in separating in any legal form from the service an officer or soldier or consenting to his separation therefrom, and *remanding him to the civil status at which the military jurisdiction properly terminates*, the United States . . . must be deemed in law to waive the right to prosecute him before a court-martial for an offence previously committed but not brought to trial. In this view, a subsequent re-appointment or re-enlistment into the army would not revive the jurisdiction for past offences, but the same would be properly considered as finally lapsed.

*Clardy*, 13 M.J. at 309 (Emphasis in original.).

11

The majority further reasoned:

> Colonel Winthrop's remark . . . would be consistent with a
> view that, where a servicemember is discharged *prior to
> the expiration of his enlistment* for the specific purpose of
> immediate reenlistment, he is never remanded 'to the civil
> status,' so he can be tried for offenses committed in the
> earlier enlistment.

*Id*. at 310 (Emphasis added.).

In an explanatory footnote, the court wrote:

> This type of discharge is now often referred to as a "short-
> term discharge" -- *i.e.*, a discharge given to a
> servicemember even before he completes his obligated
> term of service, which is granted for the mutual
> convenience of the servicemember and the Government in
> order to allow him to reenlist immediately and thus remain
> on active duty.

*Id*. at n4.

Affirming this court's decision to set aside the findings of guilty of the crimes that the soldier had committed in his previous enlistment, *Clardy* prospectively established the short-term discharge exception to a jurisdictional bar based on a break in service. However, this exception was narrow:

> [W]e do not question that under *Hirshberg* military
> jurisdiction is terminated by a discharge *at the end* of an
> enlistment or period of obligated term of service even
> though the servicemember immediately reenters the
> service. This break in "status," irrespective of the length
> of time between discharge and reenlistment, is sufficient
> to terminate jurisdiction.

*Id*. at 316 (footnote omitted) (Emphasis in original).

Following his acquittal and release from incarceration, appellant served continuously on active duty on active duty until 12 June 1989. We further find as fact that, the next day, appellant continued to maintain significant indicia of military status and reenlisted. Until 22 May 1989, appellant's post-acquittal military service was pursuant to his contractual enlistment, the fulfillment of which had been tolled during his civilian confinement. However, once his confinement-related absence

12

was excused on 22 May 1989, appellant's ETS date reverted to 27 August 1986 (at the latest).  Therefore, from 22 May until 12 June 1989, appellant served on active duty beyond the "period of obligated service" required by his enlistment.  We further find appellant's discharge appeared to be, as a *matter of fact*, solely for the purposes of immediate reenlistment; however, as a *matter of law* under *Clardy*, we cannot characterize appellant's discharge as "short-term," where it occurred *after* his contractual service obligation expired.  We therefore find appellant's military status terminated—albeit briefly—immediately before his reenlistment.[7]

Our resolution of this first question, however, is not dispositive, for we must consider whether subject matter jurisdiction was nonetheless preserved under the version of Article 3(a), UCMJ, applicable to the case.  In response to *Hirshberg*,[8] Congress passed legislation codified at 10 U.S.C. § 803(a) (1950): [9]

> Subject to section 843 of this title (article 43) [statute of limitations], no person charged with having committed, while in a status in which he was subject to this chapter, an offense against this chapter, punishable by confinement for five years or more and for which the person cannot be tried in the courts of the United States or of a State, a Territory, or the District of Columbia, may be relieved from amenability to trial by court-martial by reason of the termination of that status.

Appellant argues Article 3(a), UCMJ, does not confer jurisdiction, because he "could have been tried in a U.S. state, territory, or the District of Columbia.  In fact, he *was* tried twice by North Carolina."  According to appellant, the "more logical and appropriate definition of 'cannot be tried' is 'could not have been tried.'"  Appellant writes, "the CAAF in *Willenbring* also reiterated that Congress' intent

---

[7] Considering this finding, it is unnecessary to consider the effect of any statutory time limit, under 10 U.S.C. § 651 (1976), on appellant's initial enlistment term.

[8] In *United States v. Gallagher*, 7 U.S.C.M.A. 506, 509, 22 C.M.R. 296, 299 (C.M.A. 1957), our superior court wrote, "[w]e have not the slightest doubt but what Congress passed this statute for the principal purpose of covering the situation brought about by the decision in [*Hirshberg*]."  In support of this observation, the court provided detailed excerpts from the associated legislative history.

[9] Congress amended the statute in 1992, removing the five-year confinement and "cannot be tried" in civilian courts provisions.  Pub. L. 102–484, div. A, title X, § 1067, Oct. 23, 1992.

behind Article 3(a) was meant to only confer 'jurisdiction to serious offenses that *could not* otherwise be tried.'" (internal quote from *Willenbring v. Neurauter*, 48 M.J. 152, 161 (C.A.A.F. 1998)) (Emphasis added by appellant).

Essentially, appellant argues we should replace Article 3(a)'s present tense "cannot" with the past tense "could not." However, these words are not fungible. Describing "cannot" as "[t]he negative form of can," the American Heritage Dictionary of the English Language (Third Edition, 1992) defines the present tense verb "can" as, *inter alia*, "possession of a specified power, right, or privilege." The same dictionary describes "could" as the "[p]ast tense of can . . . [u]sed to indicate ability, possibility, or permission in the past."[10]

When analyzing the jurisdictional disputes in this case, we recognize "[a] court-martial organized under the laws of the United States is a court of special and limited jurisdiction." *Runkle v. United States*, 122 U.S. 543, 555 (1887). Had Congress intended for Article 3(a), UCMJ, to be applied with a view toward a state or federal court's past ability to try a case, we are confident it would have used the "could not have been tried" phrase–or an equivalent variant–for which appellant advocates. Instead, the statute is worded in a manner which requires us to evaluate whether such courts "cannot."

We return to the *Willenbring* decision in resolving this question against appellant. In that case, the accused was charged with rapes occurring on a federal enclave in the United States. However, at the time of his court-martial, prosecution in federal district court was barred by the following statute of limitations:

> Except as otherwise expressly provided by law, *no person shall be prosecuted, tried, or punished* for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

---

[10] In *Willenbring*, at the time of preferral, one might have said, "The government could have tried the accused in a federal district court within the statute of limitations under 18 U.S.C. § 3282, but because that time has expired, now it cannot." Similarly, at the time of appellant's court-martial—and today, for that matter—one might have said of the prospects of a North Carolina trial, "The state could have, and did, prosecute appellant previously; the state cannot do so today, because of the constitutional protection against double jeopardy." These hypothetical statements illustrate the fundamentally different meanings of "could not" and "cannot."

*Willenbring*, 48 M.J. at 176 (quoting 18 U.S.C. § 3282 (1994)) (Emphasis in original).

Focusing on the effect of a statute of limitations, our superior court wrote, "a statute of limitations does not establish a defense to the merits of a charge; rather, it is a limitation on the power of a prosecutor to bring charges and on the power of a court to try a case." *Id.* (citing *Waters v. United States*, 328 F.2d 739, 743 (10th Cir. 1964)). After discussing the practically, if not legalistically, jurisdictional effect of a statute of limitations, the court noted the absence of the word "jurisdiction" from the law now in question:

> [E]ven though Congress specifically used the word "jurisdiction" at several points in the drafting of other aspects of Articles 2 and 3, it did not use that word in the Article 3 criteria limiting court-martial jurisdiction over prior-service offenses, which it could have done by restricting military trials to cases outside the "jurisdiction" of civilian courts. Instead, the statute referred to cases that "cannot" be tried.

*Willenbring*, 48 M.J. at 177.

This observation squarely addresses appellant's argument that Article 3(a), UCMJ, only allows court-martial jurisdiction where a state or federal court lacks its own jurisdiction to adjudicate the case. The statute is not so limited. Of course the bar to Willenbring's civilian prosecution was different from the one here, but any distinction between the two works to appellant's detriment, because his constitutional double jeopardy protection against further state prosecution is at least as powerful as, and perhaps more powerful than, another's benefit under a statutory limitations period.[11]

For these reasons, we find by a preponderance of the evidence that despite any break in service created by appellant's discharge and reenlistment, the version of

---

[11] On remand, the trial judge determined no break in Willenbring's service occurred. On appeal of his subsequent conviction and sentence, our court found jurisdiction was based on his continuous military service, further determining "we need not consider whether the criteria of the applicable version of Article 3(a), UCMJ, have been met." *United States v. Willenbring*, 56 M.J. 671, 676 (Army Ct. Crim. App. 2001) (citing *Willenbring*, 48 M.J. at 175). Our superior court summarily affirmed. *United States v. Willenbring*, 57 M.J. 321 (C.A.A.F. 2002), *cert. denied*, 537 U.S. 1112 (2003).

Article 3(a), UCMJ, in effect at the time of his court-martial provides jurisdiction over the offenses of which he was found guilty.

## II – C. THE GOVERNMENT FAILED TO PROVE SUBJECT MATTER JURISDICTION OVER THE OFFENSES BECAUSE THE ALLEGED OFFENSES WERE NOT SERVICE CONNECTED.

The Supreme Court overturned the service-connection requirement for court-martial jurisdiction in *Solorio v. United States*, 483 U.S. 435 (1987). Citing Justice Stevens's concurring opinion in *Loving v. United States*, 517 U.S. 748, 774 (1996), appellant asserts *Solorio* was limited to non-capital cases: "*Solorio's* review of the historical materials would seem to undermine any contention that a military tribunal's power to try capital offenses must be as broad as its power to try noncapital ones."

Appellant also cites *United States v. Gray*, 51 M.J. 1, 11 (C.A.A.F. 1999), a capital case in which our superior court recognized Justice Stevens's concurrence but declined to decide the question of *Solorio's* reach. Instead, our superior court determined it was unnecessary to do so because, assuming arguendo *Solorio* left intact the service-connection jurisdictional requirement in capital courts-martial, the facts in *Gray* satisfied it.

Justice Stevens's separate concurrence in *Loving* does not control the result here. We perceive nothing in the *Solorio* majority opinion which limits its holding to non-capital cases. Considering the holding therein—that court-martial jurisdiction depends on whether the accused "was a member of the Armed Services at the time of the offense charged," *Solorio*, 483 U.S. at 451—we can identify no principle of law to support appellant's tacit argument that it must specifically identify classes of cases to which it extends.

The following passage from the *Loving* majority further informs our opinion on the topic:

> In 1950, Congress confronted the problem of what criminal jurisdiction would be appropriate for Armed Forces of colossal size, stationed on bases that in many instances were small societies unto themselves. Congress, confident in the procedural protections of the UCMJ, gave to courts-martial jurisdiction of the crime of murder. *Cf. Solorio, supra*, at 450-451 (Congress may extend court-martial jurisdiction to any criminal offense committed by a service member during his period of service). It further declared the law that service members who commit

> premeditated and felony murder may be sentenced to death by a court-martial.  There is nothing in the constitutional scheme or our traditions to prohibit Congress from delegating the prudent and proper implementation of the capital murder statute to the President acting as Commander in Chief.

*Loving*, 517 U.S. at 768-69.

While recognizing the passage is dicta, we note the Supreme Court in *Loving* cited *Solorio* but did not take the opportunity to qualify a service member's jurisdictional eligibility for capital punishment with any service-connection requirement.  Therefore, we hold, in accordance with *Solorio* and *Loving*, an accused's military status at the time of the offense under the UCMJ is the sole criterion for establishing subject matter jurisdiction in a court-martial, capital or otherwise.

## III. THE EGREGIOUS DELAY FROM MASTER SERGEANT HENNIS' ACQUITTAL IN STATE COURT IN 1989 TO THE ARMY'S PREFERRAL OF CHARGES IN 2006 VIOLATED MSG HENNIS' DUE PROCESS RIGHTS.

Denying appellant's similarly grounded motion before trial, the military judge found, *inter alia*, the following facts:

> There is no evidence that the Government, intentionally or otherwise, used the time from the acquittal in state court in 1989 to the preferral of these offenses on 10 November 2006 to gain some sort of tactical advantage.  Evidence of the Army's good faith in this process is that the accused's command held in abeyance the execution of his administrative discharge for a civilian conviction in 1986 pending appellate review.  That appellate review ended in a reversal and the accused's subsequent acquittal in state court.  The Army acted reasonably in accepting the results of the civilian justice system in 1989 and allowing the accused to continue with his military career.  There is no evidence the Army became involved in investigating this case after the acquittal in 1989 until after the local civilian authorities provided it with the new DNA evidence test results in 2006 during its cold case review.  The military authorities at Fort Bragg proceeded in a timely manner after receiving that new evidence.

To obtain relief for pre-preferral delay under the Fifth Amendment Due Process Clause, which grants protections beyond an applicable statute of limitations, an accused must show the "prosecutor intentionally delayed the indictment [here, preferral] to gain a tactical advantage *and* that the [accused] incurred actual prejudice." *United States v. Reed*, 41 M.J. 449, 452 n.1 (C.A.A.F. 1995) (quoting *United States v. Byrd*, 31 F.3d 1329, 1339 (5th Cir.1994)).

Citing *United States v. Lovasco*, 431 U.S. 783 (1977) and *United States v. Marion*, 404 U.S. 307 (1971), the military judge concluded appellant had not met his burden to establish a due process violation and denied the motion to dismiss. Appellant does not argue the military judge abused his discretion, which is the correct standard for our review of this issue. *Reed*, 41 M.J. at 453 (Sullivan, C.J., dissenting) (citing *United States v. Fuzer*, 18 F.3d 517, 519 (7th Cir. 1994)). *See also United States v. Sherlock*, 962 F.2d 1349, 1354 (9th Cir. 1992), *cert. denied sub nom. Charley v. United States*, 506 U.S. 958 (1992). The military judge's findings of fact were not clearly erroneous, and his application of the applicable law was correct. We hold the military judge did not abuse his discretion in denying appellant's motion to dismiss.

### IV. THE MILITARY JUDGE'S DENIAL OF EXPERT ASSISTANCE IN TESTING EVIDENCE POSSESSED BY THE GOVERNMENT DENIED MSG HENNIS HIS RIGHT TO PRESENT A DEFENSE.

On 27 April 2009, appellant filed a Motion to Compel Appointment of Experts and/or Equal Access to Evidence or for Appropriate Relief. Despite its title, the motion itself provided few examples of evidence to which appellant sought access by two requested experts, Dr. EB and Mr. PB. Appellant did specifically mention in Appellate Exhibit 154 his desire to gain access to anonymous "Mr. X" letters, in which the writer suggested another person committed the crimes:

> These letters were analyzed by government experts using DNA and non-DNA analysis. The results do not connect MSG Hennis as the author. Yet, the government is denying access by the defense experts to these potentially exculpatory letters.

Despite the motion's vagueness, multiple enclosures thereto provided a clearer picture of what appellant wanted to analyze.[12] For example, in his 25 March

---

[12] Defense-requested items, listed by Cumberland County Sheriff's Office evidence voucher numbers:

(continued . . .)

(. . . continued)

22 - Plastic bag of fibers from [Miss KE's] left hand
24 - Plastic bag of nail clippings from [Miss KE's] left hand
25 - Plastic bag of nail clippings from [Miss KE's] right hand
26 - Plastic bag of fibers from [Miss KE's] mouth
28 - Plastic bag of nail clippings from [Miss EE's] left hand
29 - Plastic bag of nail clippings from [Miss EE's] right hand
30 - Plastic bag from [Miss EE] containing hair from body and clothing
33 - Brown bag containing pubic hair from [Mrs. KE]
36 - Cardboard container containing vaginal smears of [Mrs. KE] by medical examiner's office
37 - Cardboard container containing anal and oral smear from [Mrs. KE] by medical examiner's office
38 - Yellow envelope containing vaginal swabs of [Mrs. KE]
39 - Small box of oral swabs from [Mrs. KE]
40 - Clear plastic bag containing left hand fingernail and fibers from [Mrs. KE]
41 - Clear plastic bag containing right hand fingernail and fibers from [Mrs. KE]
42 - Clear plastic bag containing hair and fibers from back of [Mrs. KE]
60 - Yellow envelope containing hair from foot of bed in master bedroom
62 - Yellow envelope containing hair from blue cover in master bedroom
63 - Yellow envelope containing hair from chest of [Mrs. KE]
64 - Yellow envelope containing hair from outside door of master bedroom
66 - Yellow envelope containing hair from leg of [Mrs. KE]
67 - Yellow envelope containing hair on carpet beside [Miss EE's] body
68 - Yellow envelope containing hairs from between [Miss EE's] legs on carpet
69 - Yellow envelope containing hairs from [Miss EE's] groin
71 - Yellow envelope containing hair from pillow from first bedroom
72 - Yellow envelope containing hair from bed near [Miss KE] in first bedroom
82 - Brown paper bag containing four envelopes of drain pipe parts and a glass jar of sink contents
83 - Brown paper bag containing five envelopes of drain parts and hair with one glass jar of water from drain

(continued . . .)

2009 letter requesting appointment and funding of Dr. EB, a DNA expert, civilian defense counsel wrote:

> A complete list of items to be forensically analyzed, whether by DNA analysis or other analysis, is attached. Some of the items have been analyzed by the government and some have not. Part of the purpose of analyzing items that have not previously been examined is investigatory, i.e., to determine whether other suspects or third parties were present at the crime scene and potentially involved in the crimes . . . . This list is not exhaustive as [the requested expert] has indicated that further consultation may disclose that additional items should be examined.

Civilian defense counsel attached and similarly referred to this list of items in a 6 April 2009 letter requesting appointment and funding of Mr. PB, a criminalistics expert, "mean[ing] fiber, hair, fingerprint and document analysis."

---

(. . . continued)

84 - Brown bag containing three envelopes of drain pipe parts, one connect pipe, and two glass jars with drain water

88 - Brown bag of three envelopes containing vacuum particles from living room carpet

89 - Brown paper bag of three envelopes containing vacuum particles from master bedroom carpet

100 - Yellow envelope containing hair from master bedroom sink's countertop

101 - Yellow envelope containing white bath sponge with hair on same

102 - Yellow envelope containing bar of soap with hair on same

103 - Yellow envelope containing paper tissue from trash can in master bedroom with hair on same

111 - Yellow envelope containing eight latent lift cards lifted at crime scene 5/29/85

112 - Yellow envelope containing three latent lift cards lifted at crime scene 5/22/85

114 - Brown paper bag containing hair collected from [family] living room and known head hair samples of Mr. JR, Ms. JC, and Mr. BW

115 - Clear plastic bag containing sixty-four latent lifts and eight photo copies of Mr. X letters

[104] - Original Mr. X letters and envelopes

In an Article 39(a), UCMJ, session on 8 May 2009, the military judge heard parties' arguments on the motion; no witnesses testified. In response to the military judge's observation that the defense had apparently not used the experts after the convening authority appointed them, civilian defense counsel explained, "we were basically waiting for the government to complete their testing and to have all of the evidence back at this location so that we could send it off to our experts at one time."

Seeking to clarify the proposed responsibilities of Dr. EB and Mr. PB, the military judge asked about the scope of work for Dr. DK, another defense expert. Civilian defense counsel explained, "[Dr. DK's] focus was on examining the lab work performed by the government experts. So we were not bringing him on board-- we did not request him for the purpose of analyzing any evidence." Defense counsel then stated: "Dr. [EB] . . . is the one who is actually going to do an analysis on the evidence. So they are not duplicating their efforts. They're working in completely different areas."

The military judge and civilian defense counsel had the following exchange:

> MJ: But the government has already provided Dr. [DK]?
>
> CDC: Right. And there are no issues about Dr. [DK]. Now, with Dr. [DK], though, where his role comes in is that one of the reasons that we did not specifically identify what items we wanted tested is because--or re-analyzed by Dr. [EB] is because we wanted Dr. [DK's] input after looking at the lab results by [United States Army Criminal Investigation Laboratory] USACIL or whatever labs--the [State Bureau of Investigation] SBI lab, whatever labs the government used--we wanted Dr. [DK's] input in terms of his recommendations of what items we should send off for analysis.
>
> MJ: So you are only going to send off for analysis those items which Dr. [DK] suggests that you do?
>
> CDC: Dr. [DK] or one of our other experts. He was one person who provided input to us, and he did not complete his work until January of this year.
>
> MJ: So Dr. [DK] has examined all of the evidence, and he completed his work in January?
>
> CDC: Yes, Your Honor.

21

MJ:  And he has made certain recommendations as to items which he believes should be retested or tested-- either tested anew or tested which wasn't tested originally?

CDC:  Yes, Your Honor.  We also--we have been provided a number of--we've been provided an investigator, Mr. [TVO].  We've also been provided another crime scene expert.  We have basically asked our--those experts who have already been provided to us for their input as well, based on their expertise and experience.  So you see, as an attachment to our request for Dr. [EB] and for Mr. [PB], a list of exhibits that we want to send off for testing.  Those exhibits were created based on the inputs of our other confidential consultants.

[. . .]

MJ:  As I understand it, the defense theory is that someone else raped and murdered these individuals?

CDC:  Exactly, Your Honor.

MJ:  And it's not a case of there was any consensual sex at all; there was never any sex and so someone else had raped [Mrs. KE] and killed her and her two children?

CDC:  Yes, Your Honor . . .

In an 11 May 2009 ruling which granted the motion in part and denied it in part, the military judge found:

As set forth in the enclosures to the appellate exhibits, the government originally granted the defense request for the appointment of Dr. [EB] as a forensic serology/DNA analyst and Mr. [PB] as a forensic criminalist.  The government rescinded those appointments after the government believed the defense was not utilizing their expert services.  The government later re-appointed Dr. [EB] as an expert consultant; however, the government limited Dr. [EB's] access only to certain evidence.

The defense has shown, and the government initially conceded, that the requested expert assistance is necessary.

The defense requests the court order the government to provide access to the evidence set out in enclosure 1 to AE 154. The defense has had access to inspect the requested evidence located in the law enforcement evidence locker. The defense is essentially requesting the court to order the evidence be sent to the defense experts for inspection and testing at the defense expert's lab. The evidence consists of essentially three groups.

[1] Evidence which was tested and inculpates the accused. The defense has shown how further testing of that evidence is necessary for the preparation of its case.

[2] Evidence which was tested and exculpates the accused because it does not link the accused to the crime scene. Those test results allow the defense to argue to the court members the exculpatory nature of that evidence. The defense has not shown how additional testing by defense experts of that established exculpatory evidence will materially add to the preparation of the defense case.

[3] Evidence which was not analyzed by government experts. The failure by the government to test some items seized from the crime scene necessarily allows the defense to argue that absence of evidence exculpates the accused. The defense has not shown how testing of that type of evidence will materially add to the preparation of the defense case.

The defense motion is granted in part and denied in part:

[1] The government will arrange for the expert consultant services of Dr. [EB] and Mr. [PB]. Those experts will be a part of the defense team with the same confidentiality as any other member of the defense team.

23

[2] The government will arrange for the delivery of the [vaginal smears from Mrs. KE, vaginal swabs from Mrs. KE, left hand fingernail and fibers from Mrs. KE, right hand fingernail and fibers from Mrs. KE, 64 latent lifts and 8 photo copies of Mr. X letters, original Mr. X letters and envelopes] to the defense expert's lab . . .

[3] The motion to provide all of the other evidence listed in enclosure 1 to AE 154 to the defense expert's lab is denied. If the defense is able to show how further inspection and possible testing of the evidence described in [subparagraphs 2 and 3] above is material to the preparation of its case, the court is willing to reconsider its ruling.

On 10 July 2009, the defense filed a motion to continue the court-martial until 11 January 2010, "in order to allow the defense sufficient time to conduct DNA analysis of evidence now in the possession of the government and engage in trial preparation." The defense also wrote that the evidence regarding which the military judge granted testing in his 11 May 2009 ruling had been provided to Dr. EB and Mr. PB for analysis. The defense stated its "inten[t] to revisit and justify additional testing and analysis." However, Dr. EB's work was pending completion, and the defense continued:

Without his consultation and analysis, the defense is unable to proceed at this time on three motions: due process, former jeopardy and third party exculpatory evidence, not to mention an anticipated motion for additional laboratory analysis.

On 28 July 2009, the military judge ordered the court-martial continued until February 2010. On 3 September 2009, civilian defense counsel filed a motion requesting additional expert funding for Dr. EB, writing, *inter alia*: he had been unable to complete the testing and consultation services previously ordered by the military judge; and, the convening authority denied additional funding to facilitate consultation. Civilian defense counsel also wrote that Dr. EB had not been able to forensically examine the Mr. X letters before exhausting the previously ordered funding.

The military judge held an Article 39(a), UCMJ, session on 9 September 2009 to address, *inter alia*, the defense's request for additional funding. Defense counsel explained he was working with Dr. [EB] to not only examine the evidentiary items which he had received, but also to develop one of multiple "affidavits from several

24

experts supporting . . . additional testing." Referring to a future Article 39(a), UCMJ, session scheduled for 29 September 2009, defense counsel continued:

> Those 10 [additional] hours are for consultation with Dr. [EB] to fully understand what he's done so far, prepare an affidavit to submit to the court that says--from an expert that says, "Hey, here are some things that were not tested but in my experience should be tested, and here's how they will help the case. Here's how they are material to the preparation of the case," which is what the court at least alluded to in its order and its statement regarding potential reconsideration. That's what the defense is trying to do was to give the court, as promptly as possible, that material so that it could rule.

On 10 September 2009, the military judge ordered, *inter alia*, additional funding for Dr. EB's DNA expert consultation. As foreshadowed by the previous day's motion session, the defense filed another motion, dated 25 September 2009, seeking the military judge "to order the government to fund additional DNA analysis and to order that the government provide the defense equal access to evidence . . . ." The defense additionally wrote:

> Upon further consultation with Dr. [EB] and Mr. [LR], the defense crime scene analyst and reconstructionist, the defense hereby renews the motion for equal access to evidence and funding in the amount of $20,000 for examination of evidence and additional DNA testing.

The motion included subsequent declarations signed by Mr. LR and Dr. EB and requested the military judge to allow *ex parte* defense submissions, "if the proffered declarations are found to be inadequate . . . ."

Mr. LR's declaration contained, *inter alia*,[13] the following:

---

[13] The declaration included "a three level priority list of evidence . . . and type of significant findings to be examined . . . ." The list contained 147 line items, ranging from the vaginal swab obtained from the autopsy of [Mrs. KE's] body to four toboggans and duffle bag fibers obtained from appellant's residence. At the subsequent Article 39(a) session, civilian defense counsel informed the military judge that the defense sought access to examine and test this broader list.

A Crime Scene Analyst, when employed as a defense consultant, often does more than analyze items of evidence or even simply analyze items that have been subjected to analysis by government experts. The analyst consults with defense counsel as part of the investigative team, with the goal of locating, identifying, and sampling items of evidence to determine whether bloodstains, hair, fibers, fingerprints, shoeprints, handwriting, or other physical evidence exists that can be used to identify individuals involved in the crime or present at the crime scene and patterns of activity at the crime scene or at other locations relevant to the commission of the crime.... Thus, these services are more comprehensive than simply performing a laboratory analysis.

Based on my experience, it is not unusual for government analysts to mishandle or miss sources of relevant evidence seized at a crime scene or other locations. This evidence can be exculpatory. I also realize that the defense often has access to information not known by the government. That is why confidentiality is important. Using information from defense counsel or other members of the defense team, I often examine or sample items of evidence that are not analyzed by government experts, because they may be relevant to a defense theory that is not held by the government. Additionally, in the course of consulting with the defense team, it has not been uncommon that in the course of performing my services, other items of evidence than those originally identified become important . . . .[14]

Dr. EB's declaration contained, *inter alia*, the following:

---

[14] Mr. LR would testify later at trial as a defense witness and, while the contents of his testimony were unknown to the military judge when he ruled on the motion, it is not irrelevant to our appellate review. Called by the defense and recognized as an expert in forensic crime scene analysis, Mr. LR said he focused on the blood, fiber, hair and fingerprint analyses—not DNA. He further testified that the law enforcement agencies "processing this reportedly did a good job. I haven't seen all the paperwork that would have been involved." He responded, "No," in response to a question from the panel whether his review of the case yielded "anything out of the ordinary based on the standards that were applicable in 1985?"

At this point, I have independently analyzed certain items of evidence already analyzed by government experts. My confidential report of this work is dated July 22, 2009. I have not yet analyzed what has been characterized as the "Mr. X" letters and envelopes. I also understand that the convening authority disapproved a defense request for me to examine and analyze other items of evidence deemed relevant to defense counsel. This affidavit justifies my access to other items of evidence deemed relevant for examination and potential DNA analysis by defense counsel.

[. . .]

It is my understanding that the government does not challenge my credentials or expertise, they simply seek to deny the defense access to certain items of evidence for the purpose of my examination and analysis. Therefore, my comments below address the reasons for requiring access to the disputed items of evidence.

A forensic serologist, when employed as a defense or prosecution consultant in a criminal case, often does more than analyze items of evidence that have been subjected to analysis by government experts. The serologist consults with defense counsel, with the goal of locating, identifying and sampling items of evidence to determine whether biological material exists that can be used to identify individuals involved in the crime or present at the crime scene or at other locations relevant to the commission of the crime. Expert serologists may also prepare reports to aid defense counsel in identifying who was present at the crime scene, the association of one individual with another at the crime scene or to develop a more comprehensive understanding of the series of events at the crime scene. Thus, these services are more comprehensive than simply performing a laboratory analysis . . . .

Based on my experience, it is not unusual for government analysts to miss sources of relevant biological matter seized at a crime scene or other locations. This evidence can aid in identifying who was at the crime scene. I also realize that the defense may have access to information

27

> not known by the government. Using information from defense counsel, I often examine or sample items of evidence that are not analyzed by government experts, because they may be relevant to a defense theory. Additionally, in the course of consulting with the defense counsel, other items of evidence than those originally identified become relevant . . .
>
> In this case, it is my understanding that MSG Hennis was previously tried twice for the same offenses for which he is currently charged. Furthermore, over the years multiple experts have investigated this case and analyzed evidence from the crime scene. According to defense counsel, no one has been able to prove whether there were two or more perpetrators in this case. Importantly, defense counsel believe no forensic evidence has established that MSG Hennis was ever physically present in any of the rooms where the murders occurred. Finally, defense counsel state that no physical evidence from the crime scene was ever located in or on property possessed by MSG Hennis. Given this context and in light of their duty to provide effective assistance, it is critical that the defense attorneys receive broad latitude in their investigation of the extent [sic] physical evidence. This investigation includes the confidential investigation of biological evidence from the crime scene and perhaps other locations that defense counsel believe may reveal the identity of perpetrators not revealed or considered by the government's investigation.
>
> In my judgment defense counsel should be given access to appropriate items of physical evidence for examination and potential DNA testing. The evidence defense counsel deems necessary to provide effective assistance to their client has apparently already been specified. Defense counsel is in the best position to identify such evidence because they are the ones with the most complete knowledge of the case history . . . .

On 1 October 2009, the military judge heard argument in an Article 39(a), UCMJ, session, which began with civilian defense counsel indicating that the motion constituted a request to reconsider his 11 May 2009 ruling, *supra*. Civilian defense counsel also stated he was now seeking access to additional items, listed in an attachment to Mr. LR's declaration. After the military judge confirmed with

government counsel that its DNA analysis of the vaginal swabs was "[t]he only forensic evidence" linking appellant to the crime scene and that fingerprints, footprints, hair, fibers and blood excluded him, civilian defense counsel argued:

> Your Honor, in that regard, obviously there are two ways-- there are a couple of different ways to defend a case. One is to hold the government to its burden of proof and to say that--and argue just those points that were made through the questioning with the trial counsel. Another way to defend a case is to prove that someone else could have committed the crime--for the defense to put on affirmative evidence to show that someone else was present at the crime scene and, therefore, is the potential perpetrator.
>
> [. . .]
>
> [I]f you find the same DNA evidence in one room and the same DNA into [sic] another room and you find more of it and, if at some point, some of it can be shown to have originated from sperm and it's not the accused's sperm, then that is very strong exculpatory evidence at that point. But as it sits right now, without our experts being able-- either of our experts--both our DNA expert and our non-DNA expert being able to look at that evidence, then you've essentially tied one hand behind our backs as defense counsel whereas the government has freedom to test and examine all of the evidence.

The military judge and civilian defense counsel later had the following exchange:

> MJ: Let's assume for the moment that they analyze the hair and determine they can do the DNA testing. If the testing that's been done already excludes the accused as the contributor of that hair, how does further testing make that even more exculpatory?
>
> CDC: Further examination, Your Honor, may lead to DNA analysis, which may lead to a DNA profile, which through CODIS [Combined DNA Index System] and other databases, may point to someone else who committed the crime . . . .
>
> MJ: In order to build a potential DNA profile?

CDC:  That's correct, Your Honor.  And, furthermore, if you test a hair and you can get a DNA reading on it and then you test a towel and you get the same DNA reading on the towel, and now you have two items of evidence that connect another person to the crime scene.  And if the towel is a towel that has the blood of the victims on it, then that would be pretty significant evidence, Your Honor.  So you may not have identified exactly who that person is, but now you have put together some pretty strong and powerful circumstantial evidence to show that it was not Sergeant Hennis . . . .

[. . .]

MJ:  It might be helpful if I were to know the results of your expert's analysis of the DNA swab and smear in order to put your argument in context.

CDC:  Your Honor, I will say right now it's totally irrelevant to this issue.  First of all, we have been limited in how we can connect that information with other information from the crime scene and in consultation with our experts.  And so one aspect of this is that semen was found in these vaginal swabs inside [Mrs. KE's] body, but you don't know where you go with that information.

MJ:  Well, if for instance, the experts who analyzed the DNA evidence came to opposite conclusions as to who contributed the DNA sample that might put things in a different context.

[. . .]

MJ:  My concern is, Mr. Spinner, that the evidence is--or lack of--either there is evidence or there's lack of evidence both of which are exculpatory for the accused; and you've said that you wish to examine and then perhaps test the evidence to develop a potential DNA profile of someone else who may have contributed--

CDC:  Who may have committed the crime or then assisted in some way.

> MJ:  Yes.  But you can't cite me any case law that says you have a right to develop this potential DNA profile.
>
> CDC:  Yes, Your Honor.  I have.  I've cited [*United States v. McAllister*, 55 M.J. 270 (C.A.A.F. 2001)] and [*United States v. Walker*, 66 M.J. 721 (N.M. Ct. Crim. App. 2008)].  And those cases don't say the defense does not have a right to test other items; but they do say DNA is powerful evidence, it's unique evidence, it provides us things that we can do today that other types of forensic testing cannot do . . . .
>
> MJ:  And *McAllister* was assistance to test the items that were admitted in court?
>
> CDC:  Right, Your Honor.  But there's nothing in *McAllister* inconsistent with what I'm arguing here today.

Arguing in opposition, government counsel expressed its view that the defense conceded Mrs. KE had been raped and murdered.  This argument prompted civilian defense counsel to respond that whether she had been raped, an alleged aggravating factor, was a matter "in contest."  Government counsel continued, later indicating that four other persons of interest, Mr. WHH, Mr. PC, Mr. BWW, and Mr. JR, had provided buccal swabs, DNA analysis of which excluded them as contributors of the semen on the vaginal smear.  Ultimately, government counsel concluded his argument by agreeing with the defense motion only to the extent it would allow the defense expert to analyze the Mr. X letters.

In rebuttal, responding to government counsel's argument that the defense could not cite a case supporting its motion, civilian defense counsel referred to the earlier state proceedings in which the trial court granting defense expert access to evidence obtained during the original investigation but not otherwise tested.  The defense did not argue for permission to submit matters ex parte, instead relying on its brief.  Aside from the declarations described above, the defense offered no matters with its motion indicating the government's forensic analysis in this case was faulty.

The military judge denied the defense motion on 13 October 2009, finding and concluding *inter alia*:

> The defense request amounts to a request for the court to reconsider its [11 May 2009 ruling] which, in part, denied expert assistance to analyze and test certain items.  This defense motion also expands upon the prior defense

31

motion...and now includes all the items of evidence set out in [Mr. LR's declaration]. . . .

The defense has access to all the evidence set out in [Mr. LR's declaration]. What defense is more specifically requesting is for the court to order the government to fund a defense expert to analyze the evidence in [Mr. LR's declaration] in an effort to develop a potential DNA profile of the person or persons who were the contributors of biological matter on the evidence in an effort to identify the actual perpetrator(s). It is unclear how a specific person could be identified without comparing the results to a known DNA sample. There is no proffer that the test results would indicate when the evidence which the defense requests to be analyzed had been left in the house rented by the [E] family. The accused has the right to necessary expert assistance. He does not have the right to unrestricted expert assistance. *See United States v. Gray*, 51 M.J. 1 (C.A.A.F. 1999) and *United States v. Garries*, 22 M.J. 288 (C.M.A. 1986).

Under Rule for Court Martial 701(a)(2)(A) the government shall permit the defense to inspect *inter alia* tangible objects "which are within the possession, custody, or control of military authorities, and which are material to the preparation of the defense or are intended for use by the trial counsel as evidence in the prosecution case-in-chief at trial, or were obtained from or belong to the accused."

The defense has had the opportunity to examine and conduct independent DNA testing on the physical, linchpin, evidence the government intends to offer at trial. See *United States v. Walker*, 66 M.J. 721 (N.M. Ct. Crim. App. 2008), *United States v. McAllister*, 55 M.J. 270 (C.A.A.F. 2001), and *United States v. McAllister*, 64 M.J. 248 (C.A.A.F. 2007).

The government has previously tested some of the requested items. The results of those tests conducted by the government experts exclude the accused as the contributor of any biological matter on that evidence. Those test results are, therefore, exculpatory for the accused. While the government indicates that it does not

intend to use those items in its case-in-chief, the defense may use those items and test results in its case. The defense has not shown how further testing of items which are already exculpatory for the accused is material to the preparation of the defense.

The other items requested by the defense to be analyzed by its own experts which were not previously tested by government experts are necessarily exculpatory for the accused without any further testing because the trial counsel are precluded from arguing those non-tested items incriminate the accused in anyway. The defense has not shown how testing of those items which are already exculpatory for the accused is material to the preparation of the defense.

The defense cites no authority for the position that the accused is entitled to government funded expert assistance to analyze items which are already established as exculpatory. The defense has not met its burden to show why it is necessary for the court to order the government to fund DNA analysis on the requested items. Accordingly, the defense motion is denied. (Internal paragraph markings omitted).

"We review a military judge's decisions on requests for expert assistance for abuse of discretion." *McAllister*, 55 M.J. at 275 (citing *United States v. Short*, 50 M.J. 370, 373 (C.A.A.F. 1999), *cert. denied*, 528 U.S. 1105 (2000)). In *McAllister*, DNA analysis of genetic material taken from a victim's fingernails became the government's "linchpin" evidence, but the accused was denied the opportunity to subject it to renewed testing by a competent defense expert. Relying on the principle that an accused "must demonstrate the necessity for" expert assistance, our superior court concluded the trial judge abused his discretion by denying the requested testing. *Id.* at 275 (quoting *United States v. Garries*, 22 M.J. 288, 291 (C.M.A. 1986), *cert. denied*, 479 U.S. 985 (1986)).

We distinguish appellant's case from *McAllister*, for the military judge here granted the defense request to facilitate renewed testing on the only forensic evidence which linked appellant to the murder scene. In other words, his decision was *McAllister*-compliant. Appellant urged at trial and renews the argument on appeal that *McAllister* is not limited to an accused's opportunity to examine and test inculpatory evidence; instead, appellant insists *McAllister* reinforces the right to do so with all evidence when it will aid the preparation of the defense. We agree in principle, but appellant's case causes us to recall the fundamental showing he must

make in requesting expert assistance: "that a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (quoting *United States v. Freeman*, 65 M.J. 451, 458 (C.A.A.F. 2008)).[15]

Appellant's case is more analogous to *Lloyd*, where defense counsel requested expert assistance in blood spatter analysis, in order to defend a service member charged in connection with a bar fight involving four other people. By fight's end, three of them had stab wounds, and Lloyd, whose shirt bore multiple blood stains, was charged as the culprit. After the convening authority denied the defense request for expert assistance, the defense renewed the request with the military judge, writing, *inter alia*:

> Depending on a number of factors which the defense intends to pursue through an expert, blood may spatter a significant distance from a stab wound. For this reason, presence of an alleged victim's blood on the clothing may be far less significant than intuition, or even theories the government intends to explore, suggests. To mount an effective defense, the defense must understand the physics of bloodstain patterns to either rule out or present such a theory. This is crucial to testing the government's theory of the case and for the presentation of evidence on behalf of SrA Lloyd.

*Id*. at 98.

Affirming the service appellate court's decision, our superior court observed, "[d]ue to the different factual circumstances, particularly the fact that the evidence at issue implicated the 'linchpin' of the government's case, *McAllister I* lends little support for Lloyd's position." *Id*. at 100.

Considering the defense's decision here not to proffer specific alternate theories in this case—contrast the defense approach in *Lloyd*, including specifically naming another person as the one potentially responsible for the stab wounds—we conclude *McAllister* lends even less support. Appellant only offered the general

---

[15] The first factor involves a more specific three-part analysis: (1) why the expert is needed; (2) what the expert would accomplish for the accused; and, (3) why defense counsel is unable to gather and present the evidence that the expert would be able to develop. *United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A. 1994).

hypothesis that additional forensic testing could *potentially* disclose a DNA profile, an investigative lead which could again *potentially* lead to identifying another person who was *perhaps* in the E family home at some unknown point in time. We share the position which our superior court described under the unique factual circumstances in *Gray*: "In our view, appellant has confused his right to *necessary* investigative assistance with an unrestricted right to search for any evidence which might be relevant in his case." *Gray*, 51 M.J. at 31 (Emphasis in orginal.). We conclude the military judge was well within the bounds of reasonable discretion in denying the defense request to examine and test items of evidence beyond those described in his 11 May 2009 order.

### V. THE MILITARY JUDGE ABUSED HIS DISCRETION WHEN HE DENIED PRODUCTION OF NECESSARY AND RELEVANT WITNESSES WHO WERE CRITICAL TO A THIRD PARTY CULPABILITY DEFENSE.

On 13 January 2010, the defense moved the trial court to compel production of Mr. WHH, Mr. GS, and Ms. MK. The motion proffered the following:

> [Mr. WHH] - Will testify he lived on Hawfield Drive with [Mr. GS], near the [KE] residence. Stated in previous interview that scratches on his face around the time of the murders were as a result of a single black male trying to steal his bicycle, which differs from what he told his girlfriend. Moved from Fayetteville shortly after the murders. Refused to give hair, fingerprint, and handwriting samples in 1989. Written summaries of witness interviews from Mr. [WHH] are attached as Enclosure 9.[16]
>
> [Ms. MK] - Will testify to the following: She was a Winn-Dixie employee and she dated [Mr. WHH] in 1985 and, around the time of the [E family] murders, [Mr. WHH] had scratches on his face. He told her that "two or three black guys jumped him and beat him up." He later denied ever having the scratches. [Mr. WHH] had financial problems at the time of the murders and asked to

---

[16] The enclosure is comprised of multiple summaries of conversations between law enforcement investigators and Mr. WHH in the summer of 1989.

be transferred to Raleigh, NC shortly after the murders. A written summary of a witness interview from Ms. [MK] is attached as Enclosure 5.[17]

[Mr. GS] - Roommate of [Mr. WHH] and owner of a light-colored work van that resembled one seen outside of the [E family] home on the night of the murders.

On 20 January 2010, the military judge held an Article 39(a), UCMJ, session to address, *inter alia*, this defense motion. Asked to explain the need for Ms. MK's testimony, the defense indicated she would "emphasize the inconsistency over time that [Mr. WHH has] said different things." The military judge and defense counsel had the following exchange:

> MJ: I assume that your position is that Mr. [WHH] is a suspect?
>
> IMC: It is.
>
> MJ: And that's why you want Ms. [MK] to testify about Mr. [WHH] because you think he's a suspect?
>
> IMC: Yes, Your Honor. And you asked me my reply regarding the DNA-exclusion argument? I would note that the DNA is just one piece of forensic evidence and that, in the defense's view, it does not identify who the killer was in this case.
>
> MJ: OK. And how do you come to the conclusion that Mr. [WHH] is a suspect?
>
> IMC: It again, sir, is because of proximity--
>
> MJ: What, what's the proximity? You say around the time. I don't know what that means.

---

[17] The enclosure is comprised of a single summary of a conversation between law enforcement investigators and Ms. MK in the summer of 1989. The summary does not indicate, as suggested in the motion, that Mr. WHH denied having scratches; however, the defense did state at the motion hearing that the defense team had also spoken with her.

IMC:  With--okay--I was going proximity in terms of location.

MJ:  Okay.

IMC:  Okay.  Let me give you both, Your Honor.

MJ:  But you said around the times Mr. [WHH] had scratches on his face.  I don't know what around the time means.  That could be weeks or it could be months.  I don't know what that means.

IMC:  Well, the statement from [Ms. MK] is that she recalls it happening around that time, and I don't have days or weeks. But that's what her recollection is, that she recalls the time of the [E family] murders and that at that time or around that time that he had scratches.  He had various explanations and then later denied that the scratches ever took place.

MJ:  Well, how does that make him a suspect of three murders?

IMC:  Because the defense anticipates there will be some conversation and testimony in the government's case regarding the violence at the murder scene and that wounds to your face certainly are relevant in contrast to Master Sergeant Hennis who the next day is at a PT run and has no scratches, no signs of distress, no physical signs whatsoever.

MJ:  So anybody in or around May 1985 who had scratches on his face would be a suspect?

IMC:  Well, there's more, Your Honor.

[. . .]

IMC:  [I]t's in the proffer regarding the van.  It's in the proffer of Mr. [GS] that he was the owner of such a van. Mr. [GS] was [Mr. WHH's] roommate.

[. . .]

MJ:  How does that make Ms. [MK] a necessary witness?

IMC: . . . Ms. [MK] is a witness as to the scratches she observed and what [Mr. WHH] told her regarding those scratches and how that story changed.

Regarding the defense request to compel production of Mr. WHH, the following exchange occurred:

MJ:  Okay.  Mr. [WHH]?  Anything to add there, Defense?

IMC:  Not beyond what we've already discussed, Your Honor.

MJ:  It's your theory that he's a suspect?

IMC:  Yes, sir.

[. . .]

MJ:  What about the government's proffer that the DNA evidence or the DNA sample from Mr. [WHH] excludes him as the donor of the semen?

IMC:  Your Honor, there is--again, the defense would argue that that is not the only bit of relevant forensic evidence in this case.  There is forensic evidence at the crime scene--at the crime scene, but has never been linked and indeed the accused has been excluded as a link.

MJ:  Does it link to Mr. [WHH]?

IMC:  Mr. [WHH] to my knowledge has never been tested on fingerprints.

MJ:  So it doesn't link to Mr. [WHH]?

IMC:  I don't know, Your Honor.

MJ:  And you say he moved from Fayetteville, shortly after the murders.  What does that mean?

IMC:  I beg--

MJ: Last time you said shortly was months. So I don't know what this means.

IMC: Let me double check, Your Honor. I believe its months again.

Regarding the defense request to compel production of Mr. GS, the following exchange occurred:

MJ: Mr. [GS]?

IMC: We've addressed, Your Honor, the defense' belief that Mr. [GS] is relevant because, as a neighbor of the [E family] and a roommate of Mr. [WHH], he owned a light-colored van that matches the description that was seen close to outside the [E family] residence.

MJ: What do you expect him to say? You haven't given a synopsis of what you expect him to say, just that you say he's a roommate.

IMC: . . . He will testify that he was a roommate of [Mr. WHH] and that he was the owner of a light-colored van.

MJ: And you expect--because you think Mr. [GS] is a suspect?

IMC: I don't know whether we believe him to be a suspect.

MJ: Well, didn't--what about the government's DNA testing that excludes Mr. [WHH] as a donor of the semen?

IMC: Well, again, Your Honor, we're rehashing old ground but the DNA test, in the defense's view, is not dispositive. In its attempt to put on a defense for Master Sergeant Hennis, it's going to introduce relevant evidence and argue all reasonable inferences regarding that evidence. Whether or not Mr. [GS's] DNA evidence matches that--

MJ: Well, not Mr. [GS's]--Mr. [WHH's].

IMC: I apologize. Are we going back to Mr. [WHH], sir?

MJ:  No, but you said that Mr. [GS] is not a suspect.  You said that he was a roommate of Mr. [WHH]?

IMC:  Yes, sir.

MJ:  And that he owned a light-colored van that apparently resembled one seen outside the [E family] residence.  You have indicated that Mr. [WHH] perhaps is a suspect?

IMC:  Yes, sir.

MJ:  The government proffers that the DNA sample from Mr. [WHH] excludes him as a donor of the semen.

IMC:  And as we discussed with the discussion of Mr. [WHH], there's other forensic evidence to the defense's knowledge -- including fingerprints, hair analysis--that has not excluded Mr. [WHH].  And again, Your Honor, the relevance is that the defense does not buy the government's version that even if there is a DNA match with Master Sergeant Hennis, that is dispositive of who is the murderer.

On 26 January 2010, the military judge denied the portions of the defense motion regarding Ms. MK, Mr. WHH, and Mr. GS, and ruled as follows:

[Mrs. MK]:  She will testify that she dated Mr. [WHH] in 1985 and he had scratches on his face around the time of the [KE] murders.  While the defense theory is that Mr. [WHH] is a suspect in the [KE] murders, the defense proffered no evidence to support that theory or that Mr. [WHH] in any way resembles the person seen near the [E family] residence at the time of the murders.  The DNA sample provided by Mr. [WHH] excludes him as the donor of the semen found at the crime scene.  The defense made no proffer that the DNA testing is inaccurate.  The defense has failed to show that Ms. [MK] is a relevant and necessary witness.  The motion to order the production of Ms. [MK] is denied.

[Mr. WHH]:  His testimony is related to Ms. [MK's] testimony.  Mr. [WHH] had scratches on his face around the time of the [E family] murders.  While the defense

theory is that Mr. [WHH] is a suspect in the [E family] murders, the defense proffered no evidence to support that theory or that Mr. [WHH] in any way resembles the person seen near the [E family] residence at the time of the murders. The DNA sample provided by Mr. [WHH] excludes him as the donor of the semen found at the crime scene. The defense made no proffer that the DNA testing is inaccurate. The defense has failed to show that Mr. [WHH] is a relevant and necessary witness. The motion to order the production of Mr. [WHH] is denied.

[Mr. GS]: Mr. [GS] was the roommate of Mr. [WHH]. He will testify that Mr. [WHH] owned a light-colored work van similar to one seen outside the [E family] home on the night of the murders. While the defense theory is that Mr. [WHH] is a suspect in the [E family] murders, the defense proffered no evidence to support that theory or that Mr. [WHH] in any way resembles the person seen near the [E family] residence at the time of the murders. The DNA sample provided by Mr. [WHH] excludes him as the donor of the semen found at the crime scene. The defense has made no proffer that the DNA testing is inaccurate. Since there is no evidence connecting Mr. [WHH] to the crime scene, the relevance of the color of his van is not the least bit clear. The motion to order the production of Mr. [GS] is denied.

In *United States v. McElhaney*, our superior court succinctly re-stated the standards regarding production of witnesses:

Article 46, UCMJ, 10 [U.S.C.] § 846, provides all parties to a court-martial with "equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe." Under [R.C.M.] 703(b)(1), Manual, *supra*, "each party is entitled to the production of any witness whose testimony on a matter in issue on the merits or on an interlocutory question would be relevant and necessary." *See also* [Military Rule of Evidence] 401. A military judge's ruling on a request for a witness is reviewed for abuse of discretion. *United States v. Rockwood*, 52 [M.J.] 98, 104 ([C.A.A.F.] 1999). The decision on a request for a witness should only be reversed if, "on the whole," denial of the defense witness was improper. *United States v.*

> *Ruth*, 46 [M.J.] 1, 3 ([C.A.A.F.] 1997).  We will not set aside a judicial denial of a witness request "unless [we have] a definite and firm conviction that the [trial court] committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors."  *United States v. Houser*, 36 [M.J.] 392, 397 ([C.M.A.] 1993), quoting Judge Magruder in The New York Law Journal at 4, col. 2 (March 1, 1962).
>
> Factors to be weighed to determine whether personal production of a witness is necessary include:  the issues involved in the case and the importance of the requested witness to those issues; whether the witness is desired on the merits or the sentencing portion of the case; whether the witness's testimony would be merely cumulative; and the availability of alternatives to the personal appearance of the witness, such as depositions, interrogatories, or previous testimony.  *United States v. Tangpuz*, 5 [M.J.] 426, 429 ([C.M.A.] 1978); *Ruth, supra* at 4.  Timeliness of the request may also be a consideration when determining whether production of a witness is necessary. R.C.M. 703(c)(2)(C); *United States v. Reveles*, 41 [M.J.] 388, 394 ([C.A.A.F.] 1995).

54 M.J. 120, 126-27 (C.A.A.F. 2000).

We understand a person accused of a crime may obtain production of relevant evidence tending to show that another person may have committed the charged crime instead.  The right to obtain and present such "third party culpability" evidence is an important component of an accused's right to present a defense.  The military judge determined the proffered testimony was not relevant and necessary.  Relying heavily on the treatment of third party culpability evidence in *Holmes vs. South Carolina*, 547 U.S. 319, 327 (2006), appellant now asserts the military judge's determination was unsound.  We disagree.

In *Holmes*, the defendant was convicted of, *inter alia*, murder and sentenced to death.  At trial, the defendant was prohibited from offering evidence from multiple witnesses who would have testified about seeing another named person in the victim's neighborhood on the morning she was attacked.  The defendant also sought to call four additional witnesses who would either:  testify that the same third person admitted the defendant was actually innocent; or, testify that the same third person admitted he was the actual culprit.  Arrayed against the defendant, however, were several items of inculpatory forensic evidence, buttressed in multiple respects by DNA analysis.

Affirming the trial court's decision to exclude the third party culpability evidence, South Carolina's Supreme Court held "where there is strong evidence of an appellant's guilt, especially where there is strong forensic evidence, the proffered evidence about a third party's alleged guilt does not raise a reasonable inference as to the appellant's own innocence." *Holmes*, 547 U.S. at 324 (citing *State v. Holmes*, 361 S.C. 333, 342-43, 605 S.E.2d 19, 23-24 (2004)).

Reversing in a unanimous opinion, the Supreme Court provided examples of unconstitutional evidentiary rules, stricken because of their arbitrary nature and effect. The court continued to describe the balanced approach which trial judges must use in ruling on admissibility of third party culpability evidence:

> A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged. See, *e.g.,* 41 C.J.S., Homicide § 216, pp 56-58 (1991) ("Evidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded"); 40A Am. Jur. 2d, Homicide § 286, pp 136-138 (1999) ("[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged . . . . [Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial" (footnotes omitted)). Such rules are widely accepted, and neither petitioner nor his *amici* challenge them here.

*Id*. at 327.

Finding the state supreme court's approach arbitrary, illogical and, therefore, unconstitutional, the court wrote:

> The rule applied in this case is no more logical than its converse would be, *i.e.*, a rule barring the prosecution from introducing evidence of a defendant's guilt if the defendant is able to proffer, at a pretrial hearing, evidence that, if believed, strongly supports a verdict of not guilty. In the present case, for example, petitioner proffered evidence that, if believed, squarely proved that [a named

> third person], not petitioner, was the perpetrator. It would
> make no sense, however, to hold that this proffer
> precluded the prosecution from introducing its evidence,
> including the forensic evidence that, if credited, provided
> strong proof of petitioner's guilt.

*Id*. at 330.

Appellant now describes the military judge as falling "into the same trap [as] in *Holmes*, excluding the introduction of evidence simply because it did not necessarily square on all fours with a piece of the forensic evidence in the case." Our assessment is different. The military judge considered that DNA analysis excluded Mr. WHH as the source of sperm obtained from one of the murder victims, but this consideration was one of several. Had the military judge considered only this DNA result, he would have erred under *Holmes*. However, he went beyond the government's evidence, pressing defense counsel for any information that could fairly be described as surpassing speculation and constituting probative evidence to support a theory that Mr. WHH, worthy of suspicion as a culpable third party in the defense's estimation,[18] was responsible for the murders. *Holmes* is an important reminder of what should be a self-evident principle—the admissibility of defense evidence cannot depend on the admissibility of government evidence. However, it leaves intact an appellant's burden to establish the relevance and necessity of a requested witness's testimony. The military judge's conclusion that the defense did not fulfill this burden was reasonable and not an abuse of discretion.

**VI. THE MILITARY JUDGE ERRED IN DENYING THE DEFENSE A NEW TRIAL PREDICATED ON THE GOVERNMENT'S FAILURE TO DISCLOSE THE NORTH CAROLINA "SWECKER/WOLF" REPORT, IMPEACHMENT EVIDENCE REQUESTED PURSUANT TO A SPECIFIC DEFENSE DISCOVERY REQUEST THAT WOULD HAVE LIKELY CAST DOUBT ON THE PROCEEDINGS.**

The panel sentenced appellant to death on 15 April 2010. On 15 October 2010, the defense filed a "Motion for Appropriate Relief - Motion for a

---

[18] Interestingly, the defense team suggested a named nearby neighbor, not Mr. WHH, possessed motive and opportunity to commit the murders. According to another theory, a named person, who was involved in illegal drugs with one of the E family's babysitters, could have exacted vengeance upon the E family in retaliation for a botched drug deal involving the babysitter. The defense attributed neither of these motives, or any, to Mr. WHH.

Mistrial/Motion for a New Trial and Request for Post-Trial 39(A)." The basis for the motion was a report released on 18 August 2010 by the North Carolina Attorney General, entitled "An Independent Review of the SBI Forensic Laboratory" ("Swecker/Wolf report"). The motion cited the report's finding that Ms. BBD "misidentified or incompletely discussed blood evidence in twenty-four (24) cases." It also states that "[t]his information was not provided to the Defense prior to, or during, trial in *U.S. v. Hennis*."

The military judge held a post-trial Article 39(a), UCMJ, session on 21 January 2011 and heard the parties' arguments on the motion. He ruled on 27 January 2011, finding:

> a. Ms. [BBD] worked in the Forensic Biology Section of the State Bureau of Investigation (SBI) Crime Laboratory where she analyzed certain evidence in the course of the investigation in this case. Ms. [BBD] was qualified at trial as a Government expert in forensic serology. Ms. [BBD's] testimony included such matters as blood evidence, blood samples, vaginal swabs, luminol testing, and luminol photographs.
>
> b. The North Carolina Attorney General commissioned an independent review of the activities and performance of the Forensic Biology Section of the SBI Crime Laboratory in March, 2010, by Mr. Chris Swecker and Mr. Michael Wolf, hereinafter referred to as the Swecker/Wolf report. The North Carolina Attorney General commissioned the independent review based on a case completely unrelated to the Hennis case. The Swecker/Wolf report focused on the policies, procedures, and practices of the Forensic Biology Section of the SBI Crime Laboratory between January 1987 and January 2003. The completed Swecker/Wolf report was released on 18 August 2010. While Ms. [BBD] and her work product were not the basis for commissioning the independent review, Ms. [BBD's] work was reviewed by the commission because she had been an employee at the SBI Crime Laboratory during a portion of the time on which the Swecker/Wolf report focused its review of the SBI Crime Laboratory.
>
> c. The Swecker/Wolf report, attached to AE 531, reviewed cases unrelated to the Hennis investigation. The report speaks for itself so there is no need to summarize its findings or recommendations. However, it is important

to note paragraph 9 in its Summary Findings: "No evidence was found that laboratory files or reports were concealed or evidence deliberately suppressed. Anyone with access to the lab notes could discover the discrepancies and omissions in this report." The Defense had full access to all of the lab files and reports done by Ms. [BBD] in her evaluation of evidence in the Hennis investigation.

d. Ms. [BBD] testified that her analysis of the blood evidence and blood samples obtained during the investigation did not connect MSG Hennis to the crime scene. Ms. [BBD] testified she did not detect any blood on any evidence seized from MSG Hennis' car or from his quarters. Ms. [BBD] testified she detected a blood smear on a wall at approximately her shoulder height in the hallway of the crime scene. Ms. [BBD] is considerably shorter than MSG Hennis. Ms. [BBD] testified she detected a partial print at the crime scene using luminol testing. It was beyond her expertise to determine the shoe size of the print. A Defense expert testified, in his opinion, the shoe print was smaller than the shoe size of MSG Hennis. Ms. [BBD's] testimony was actually exculpatory for MSG Hennis. A defense counsel, in effect, conceded this during closing argument when he said that, concerning blood evidence, "[Ms. BBD] could have been a witness for the defense." ROT at 6564.

e. The Defense had evidence available at trial to use in an attempt to impeach Ms. [BBD] based on her work in an unrelated case. *See* AE 119. The Defense chose not to use that potential impeachment evidence. The court reasonably infers the Defense made a tactical decision not to attempt to impeach Ms. [BBD] because doing so would likely have undermined the Defense argument that she "could have been a witness for the defense" because of the exculpatory nature of her expert testimony.

f. There is no allegation the Defense was denied access to any of the laboratory files, reports, or test results done by Ms. [BBD] in the Hennis case. Unlike some of the files reviewed in the Swecker/Wolf report, it is important to note that the defense had access to all of Ms. [BBD's] laboratory files and notes concerning the testing she

46

conducted in the Hennis investigation. Ms. [BBD] did not testify concerning any of the DNA analysis done in this case as she is not a DNA expert. While Ms. [BBD] did testify that a vaginal slide contained sperm, the presence of sperm was corroborated by several other expert witnesses. The Defense had its own forensic experts. It is significant that the Defense has not alleged that Ms. [BBD's] analysis of the evidence in this case was wrong or misleading.

g. The evidence concerning Ms. [BBD's] work product in other unrelated cases discovered after the trial is not substantive evidence addressing the guilt or innocence of MSG Hennis. This recently obtained evidence may have been used for what value it may have served as potential impeachment of Ms. [BBD]. Assuming, without deciding, the matter contained in the Swecker/Wolf report was subject to discovery, the value of the recently obtained potential impeachment evidence is, at best, *de minimus* by itself, and even less valuable when considered in connection with the exculpatory nature of Ms. [BBD's] testimony and all other pertinent evidence.

h. A military judge may declare a mistrial, as a matter of discretion, when such action is manifestly necessary in the interest of justice because circumstances cast substantial doubt on the fairness of the proceedings. See R.C.M. 915(a). The *de minimus* value of the recently obtained potential impeachment evidence does not cast substantial doubt on the fairness of the proceedings. A mistrial is viewed as a drastic remedy reserved for those cases in which it is necessary to avoid a miscarriage of justice. *See United States v. Garces*, 32 M.J. 345 (C.M.A. 1991); [*United States*] *v. Fisiorek*, 43 M.J. 244 (C.A.A.F. 1995). The court specifically finds the lack of this recently obtained potential impeachment evidence of *de minimus* value for use at trial was harmless beyond a reasonable doubt and did not cause a miscarriage of justice. Accordingly, the motion for a mistrial is denied.

i. The defense moves for a new trial in the event the court denies the motion for a mistrial. There is a three part test to be used to determine if a request for a new trial should be granted. *See United States v. Bacon*, 12 M.J. 489

(C.M.A. 1982); *United States v. Williams*, 37 M.J. 352[,] 356 (C.M.A. 1993).  Assuming, without deciding, the defense meets the first two prongs of the test that is, the files from Ms. [BBD's] unrelated cases "were discovered since the trial" and they "could not have been discovered by the [accused] at the time of trial by the exercise of due diligence," the defense fails to meet the third prong of the test which is this "newly discovered evidence, if considered by the court-martial in light of all other pertinent evidence, would probably produce a substantially more favorable result for" the accused.  *See United States v. Williams*, *supra* at 356.

j.  The Defense cites *United States v. Webb*, 66 M.J. 89 (C.A.A.F. 2008) in support of its motion.  The potential impeachment evidence of the observer for the urinalysis test in *Webb*, whose testimony was inculpatory, was much more significant than potential impeachment evidence for Ms. [BBD] whose testimony was exculpatory for the accused.  It is important to note that while the court in *Webb* found that the trial judge did not abuse her discretion in ordering a new trial, the court in *Webb* did not find that a new trial was actually required.  This court specifically finds the *de minimis* value of the recently obtained potential impeachment evidence concerning Ms. [BBD's] work product in cases unrelated to the accused would not have probably produced a substantially more favorable result for the accused in light of all other pertinent evidence presented at trial which includes, but is not limited to, the results of the DNA testing done by experts other than Ms. [BBD], and particularly in light of the exculpatory nature of Ms. [BBD's] testimony. Furthermore, lack of this recently obtained potential impeachment evidence for use at trial did not prejudice MSG Hennis.  If anyone concludes there was any prejudice to MSG Hennis, any alleged prejudice was harmless beyond a reasonable doubt.  Accordingly, the motion for a new trial is denied.

We review a military judge's ruling on a petition for a new trial for an abuse of discretion. *United States v. Rios*, 48 M.J. 261, 268 (C.A.A.F. 1998).  In *United States v. Johnson*, our superior court restated the standards for evaluating petitions for new trial:

Article 73, UCMJ, 10 U.S.C. § 873 (2000), allows petitions for new trials "on the grounds of newly discovered evidence or fraud on the court." Implementing this UCMJ provision, Rule for Courts-Martial (R.C.M.) 1210(f)(2) [] provide[s] . . . :

(2) *Newly discovered evidence*. A new trial shall not be granted on the grounds of newly discovered evidence unless the petition shows that:

(A) The evidence was discovered after the trial;

(B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and

(C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

61 M.J. 195, 198 (C.A.A.F. 2005).

The military judge's findings of fact were well supported by the evidence and the parties' submissions on the motion, including the Swecker/Wolf report. We consider Ms. BBD's testimony predominantly exculpatory; as the main witness regarding the presence or absence of blood, she testified about the lack of such evidence linking appellant to the crime. Though her testimony included a description of intact spermatozoa on forensic slides derived from Mrs. KE's autopsy, hers was only one of multiple similar findings regarding that evidence. Assuming arguendo the Swecker/Wolf report would have achieved appellant's desired effect of impeaching Ms. BBD, we consider the implications: the exculpatory nature of her testimony diminished, to appellant's detriment; and, the inculpatory nature of her testimony perhaps somewhat diminished, given the multiple witness accounts of the presence of spermatozoa and resultant DNA analysis. The military judge remained well within the bounds of reasonable discretion in denying appellant's motion for a new trial, for the newly discovered evidence did not bring with it the "[probability to] produce a substantially more favorable result for the accused." *Id.*

**VII – A.   THE MILITARY JUDGE'S DENIAL OF DEFENSE COUNSEL'S PROPOSED VOIR DIRE AND THE SUBSEQUENT LIMITATION OF THE SCOPE AND NATURE OF VOIR DIRE DEPRIVED MSG HENNIS OF HIS CONSTITUTIONAL RIGHT IN A DEATH PENALTY CASE TO EXERCISE HIS RIGHT TO CHALLENGE FOR CAUSE PROSPECTIVE AND BIASED PANEL MEMBERS AND EXERCISE PEREMPTORY CHALLENGES.**

In his brief, appellant asserts:

> Throughout the individual voir dire of the prospective panel members, defense counsel attempted to use the Colorado Method of Capital Voir Dire (Colorado Method), the most widely accepted method of voir dire in a capital case, but was repeatedly undercut by the military judge's frequent interruptions, inconsistencies in his rulings on the "appropriateness" of voir dire questions, attempted rehabilitation of panel members, and ultimately, the truncation of the defense voir dire.  (Footnote omitted).

We appreciate appellate defense counsel's citation to Matthew Rubenstein's, *Overview of the Colorado Method of Capital Voir Dire*,[19] for it offers an excellent survey of the technique.  However, when we compare roughly 2,000 pages of voir dire transcript in this case to the method's principles, appellant's argument is unpersuasive, for it is difficult to imagine a defense voir dire more strictly adherent to the Colorado Method.  We recognize the Colorado Method is not the standard for assessing the sufficiency of voir dire; we briefly focus on it, however, to illustrate our conclusion after reviewing this record that the military judge's involvement did not prevent the defense from using it.

The right to voir dire is a component of the constitutional right an impartial jury, which the Supreme Court announced in *Wainwright v. Witt*:  "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" 469 U.S. 412, 424 (1985) (quoting

---

[19] 34-Nov Champion 18, Capital Resource Center (2010).

*Adams* v. *Texas*, 448 U.S. 38, 45 (1980)).   In *Morgan v. Illinois*, our nation's highest Court wrote of the intertwined nature of the right to jury trial and voir dire:

> The Constitution, after all, does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury.  Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors.

504 U.S. 719, 729 (1992) (citing *Dennis* v. *United States*, 339 U.S. 162, 171-72 (1950) and *Morford* v. *United States*, 339 U.S. 258, 259 (1950)).

Appellant now asserts the military judge arbitrarily intervened in voir dire and constrained the defense from asking constitutionally-required questions.[20]  We

---

[20] The military judge allowed, *inter alia*, the following questions during voir dire:

If evidence shows the accused committed the premeditated murders of a mother and two of her daughters, would you automatically vote to impose the death penalty?

If the accused--if you find the accused guilty of premeditated murders of a mother and two of her daughters, would you automatically vote to impose the death penalty?

Can you fairly consider a life sentence if the evidence shows the accused committed the premeditated murders of a mother and two of her daughters?

Would you automatically reject a life sentence if the evidence shows the accused committed the premeditated murders of a mother and two of her daughters?

If you find the accused guilty, would you automatically impose a death sentence no matter what the facts of this case were?

Have you given much thought to the death penalty before being notified as a court member? Can you fairly consider all of the evidence before reaching your determination of a sentence?

Can you fairly consider all of the sentencing alternatives, if the accused were convicted of premeditated murder, to include life and death?

(continued . . .)

understand voir dire is important in any panel case, particularly so in one with the possibility of capital punishment. However, we do not share appellant's criticism of the military judge's involvement, mindful of his "responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence . . . ." *Morgan*, 504 U.S. at 730 (quoting *Rosalez-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion)). Further considering the discretion with which trial judges are entrusted in supervising voir dire, we conclude the military judge's regulation thereof was appropriate and not an abuse of discretion.

**VII – B. THE MILITARY JUDGE, BY FAILING TO DISMISS THREE PANEL MEMBERS FOR CAUSE BASED ON ACTUAL BIAS AND IMPLIED BIAS MANIFESTED BY A PREDISPOSITION TO ADJUDGE DEATH, AN INELASTIC OPINION AGAINST CONSIDERING MITIGATING EVIDENCE ON SENTENCING, VISCERAL REACTIONS TO THE CHARGED ACTS, PRECONCEIVED NOTIONS OF GUILT, AND A BIAS TOWARD DEFENSE COUNSEL DENIED MSG HENNIS A FAIR TRIAL.**

Appellant asserts the military judge erred in denying his causal challenges against Lieutenant Colonel (LTC) B, Major (MAJ) W and LTC W. Before analyzing appellant's arguments regarding each, which analyses include rather lengthy excerpts from their individual voir dire, we restate the relevant legal principles associated with the right to an impartial factfinder, "the *sine qua non* for a fair court-martial." *United States v. Wiesen*, 56 M.J. 172, 174 (C.A.A.F. 2001) (quoting *United States v. Modesto*, 43 M.J. 315, 318 (C.A.A.F. 1995)).

---

(. . . continued)

What types of extenuation and mitigation evidence would you want to see from the defense?

Would you automatically reject a life sentence for a premeditated murder?

Do you believe the death sentence or death penalty must be imposed for all premeditated murders?
Would you automatically reject a life sentence for premeditated murder regardless of the facts and circumstances in a case?

"The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Morgan,* 504 U.S. at 728 (quoting *Wainwright*, 469 U.S at 424).

"Actual bias is personal bias that will not yield to the military judge's instructions and the evidence presented at trial." *United States v. Woods*, 74 M.J. 238, 243 (C.A.A.F. 2015) (quoting *United States v. Nash*, 71 M.J. 83, 88 (C.A.A.F. 2012)). Our evaluation of implied bias has a slightly different focus, based on an "objective test" and "the consideration of the public's perception of fairness in having a particular member as part of the court-martial panel." *Woods*, 74 M.J. at 243 (quoting *United States v. Peters*, 74 M.J. 31, 34 (C.A.A.F. 2015)).

"A military judge's ruling on a challenge for cause is reviewed for an abuse of discretion. Military judges are afforded a high degree of deference on rulings involving actual bias. This reflects, among other things, the importance of demeanor in evaluating the credibility of a member's answers during voir dire. By contrast, issues of implied bias are reviewed under a standard less deferential than abuse of discretion, but more deferential than de novo." *Woods,* 74 M.J. at 243 (quoting *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002)).

"[T]he burden of establishing grounds for a challenge for cause rests upon the party making the challenge." *United States v. Wiesen*, 57 M.J. 48, 49 (C.A.A.F. 2002) (citing R.C.M. 912(f)(3), *United States v. New*, 55 M.J. 95, 99 (C.A.A.F. 2001); *United States v. Rolle*, 53 M.J. 187, 191 (C.A.A.F. 2000); *United States v. Warden*, 51 M.J. 78, 81 (C.A.A.F. 1999); and *United States v. Giles*, 48 M.J. 60, 63 (C.A.A.F. 1998)). However, "military judges must follow the liberal-grant mandate in ruling on challenges for cause . . . ." *Wiesen*, 56 M.J. at 174 (quoting *United States v. Daulton*, 45 M.J. 212, 217 (C.A.A.F. 1996) and *United States v. White*, 36 M.J. 284, 287 (C.M.A. 1993)).

We now address seriatim the individual voir dire and causal challenges of LTC B, MAJ W and LTC W.

## A. LIEUTENANT COLONEL B[21]

DC:  One of the things that we had talked about yesterday was, of course, a situation where if you were to consider the case of a premeditated murder of children and, in the case where there is a premeditated murder that has been proven beyond a reasonable doubt of children, that you indicated that you would not consider life imprisonment to be an appropriate punishment for the premeditated murder of children . . . .

LTC B:  Okay.

[. . .]

DC: . . . My understanding of your answer yesterday was that in the case of premeditated murder of innocent children, you believe that life imprisonment was not an appropriate punishment for that crime, is that--am I misstating what you said?

LTC B:  No.  You are not misstating me.  That is correct.

DC:  Okay.  And so I wanted to make sure that I understood what was it about that situation that caused you to have that belief?

LTC B:  Well, I am a father first and foremost; and I love my kids like most of us do.

DC:  Certainly.

LTC B:  And because kids bring a great deal of innocence to their being, to take- to premeditate and to actually take a child's life is unforgiveable in my mind.

---

[21]  In group voir dire, LTC B responded negatively when the defense asked, "[D]o you agree with this statement if someone is convicted of premeditated murder of children they should be given the death penalty?"  He then responded positively when asked by defense counsel, "Do you agree with the statement that life in prison is not really punishment for premeditated murder of children?"

DC:  Certainly.  And again, that's all we are asking for is what your personal beliefs are; and again, nobody is criticizing that obviously.  So, with regard to that, the fact that it was--an innocent child has been murdered and it was done by premeditated murder, that just simply overrides anything else with regards to the appropriateness of punishment for children--appropriateness of the punishment of death?

LTC B:  I would be willing to listen to any other type of feedback.  I have my personal belief, but that doesn't mean that I would necessarily strongly stand on it from the standpoint of not listening to anything else, but I would be willing to take other types of information in the event that I am selected and there are other panelists that have other opinions that differ from mine.

DC:  Okay.  And I certainly respect that; but as I understand you though it is that your belief is--as you sit here, is that that is just--that life imprisonment would not be an appropriate punishment for someone who had with premeditation killed innocent children, meant to do it, did do it, killed innocent children, that just simply wouldn't be an appropriate punishment.

LTC B:  As I sit here and I think about it, to be honest with you, for someone who fits that category to actually execute them or however way that they are terminated-- their life is terminated, it kind of frees them from not having to think about it for the rest of their lives--

DC:  Okay

LTC B:  --as I think about it.

[. . .]

TC: . . . Sir, as has been discussed already and as I said yesterday when I was talking to the group, the law in this case that will be given to you for consideration at the end of the case will come from the military judge.  Do you understand that, sir?

LTC B:  Yes.

55

[. . .]

TC:  And so the military judge is going to tell you at the end of this case that if a person is convicted of premeditated murder, under the circumstances that are presented in this case--if convicted of premeditated murder by a unanimous vote, then there are two possible sentences that you could adjudge:  one is confinement for life and the other is the death penalty.

So with that understanding, sir, do you understand that there are two choices that you would have?

LTC B:  Yes.

TC:  Sir, will you be able to fairly and fully consider both of those choices?

LTC B:  Yes.

TC:  Sir, and in that consideration, will you be able to consider not only the aggravating evidence that is presented -- the facts of the case, the crimes--but also any mitigation, extenuating circumstances, anything else that may be presented by the defense?  Will you be able to consider all of that, sir?

LTC B:  Absolutely.

TC:  And give full and fair consideration to all of that?

LTC B:  Yes.

TC:  And, sir, you understand that, as far as the timing of it, that you are not allowed to decide until you have heard all of that evidence, to include the mitigation and extenuation?

LTC B:  I understand.

[. . .]

MJ:  [Lieutenant Colonel B], you indicated that you had learned of some--had learned of some things from the

media but had not paid much attention to it.  Can you set-- will you be able to set that aside and base your decisions based solely on what you hear in the courtroom and the law as I instruct you and the argument that you hear from counsel?

LTC B:  Yes, sir.

MJ:  Okay.  Now, with regards to some questions by counsel, you indicated that--as the scenario put forth to you by counsel with the premeditated murder of young children, you indicated that life is not appropriate.  You also indicated that, sitting here today, that imposing the death penalty may free that person from having to think about that for the rest of his life.

With those two statements, sir, if you believe that life is not appropriate, does that mean that you automatically have to vote for the death penalty if you were to sit on a panel where two little girls were the victims of premeditated murder?

LTC B:  Sir, let me clarify.  My initial--the emotional portion within me as a father, I initially said life wouldn't be appropriate.  Now, as I sat here and I was thinking about it, I had also indicated that to take someone's life as a result of premeditation in the murder would free them from having to be reminded of it for the rest of their lives. So, simply what I am saying, sir, is that I would be open-minded.  I know what my views are, but I would be open-minded to listen to other panelists.

MJ:  Are you open-minded to be persuaded by other panel members to what an appropriate sentence should be if you were required to decide on an appropriate sentence in this case?

LTC B:  In terms of persuaded, sir?

MJ:  Well, there will be a--you will be instructed, if we get to sentencing, that you should discuss appropriate-- discuss sentencing and some people during that may have differences of opinions.  Those with differences of opinions will likely discuss the individual opinion.

LTC B:  Right, sir.

MJ:  And likely, you know, try to tell other people why they believe his particular opinion is correct, not using any coercion at all--

LTC B:  Right, sir.

MJ:  --but just trying to explain, "Well, this is why I think it's right."  But are you willing to listen to what others have to say on that matter, if we get to sentencing, before you draw any conclusions to what you believe an appropriate sentence is?

LTC B:  Yes, sir.  I would.

MJ:  Now, when you have these two divergent statements with the understandable, emotional response, I have two children, two little girls are dead at the hands of premeditated murder; and then you say, well also executing that person may then free that person from having to think about that the rest of his life.  So can you envision then that, not knowing what the evidence is--but can you consider and envision that life might be appropriate depending on whatever the evidence is that comes out?

LTC B:  Yes, sir.

MJ:  So, when you say that life is not appropriate for this type of offense, please again explain to me whether that was your initial reaction or whether that is something that you concluded after giving some thought to it?

LTC B:  That was the initial reaction, sir, because I am a father.

Defense counsel challenged LTC B for cause, citing implied bias and the liberal grant mandate.  The military judge and the defense had the following exchange:

DC: . . . With regards to his views on the death penalty, again, he was another panel member who in general voir dire indicated that life in prison was not an appropriate

58

punishment for a premeditated murder of children. When questioned about that, he had very firm opinions that said it was based upon his reaction, stating that he is a father, and that killing a child--taking a child's life is unforgiveable. That this was an emotional issue with him; that it is his personal belief; that it is one that, while he would listen to others, he is not really open to persuasion; that this is the appropriate punishment. Further, and I believe most critically, he would believe that the imposition of the death penalty would be the appropriate punishment because it would "free the person to think about"–"free the person from having to think about it for the rest of their life."

Obviously an imposition of a death penalty essentially-- and not to be glib about it--because it would be good, it would release them from having that burden for the rest of their lives is an inappropriate reason to impose the death penalty. And we believe it would be an illegal reason to impose the death penalty, i.e., making a moral decision that it's going to be good for them.

MJ: Well, I got the impression from [LTC B] when he said, "The death penalty may free that person to have to think about it the rest of their life," as a reason not to impose the death penalty--that is the way I interpreted his response.

DC: Your Honor, I read that as being that it was the reason to impose the death penalty is that it would--and in either event, it would still be an inappropriate sentencing consideration. But the way that it was--the context in which the question was asked, it was asked as to why he believed the death penalty was appropriate for the premeditated murder of children; and he said it would free that person. I believe that's an inappropriate sentencing determination on the death penalty--the application of the death penalty in the premeditated murder of children.

And further, quite frankly, it comes down to the fact that he obviously had and expressed very strong personal beliefs that he simply--while he would consider as far as listening--and he put it in terms of listening to other panel members--he made it very clear that he was not open to

persuasion, that this was something that he believed and that there was no--unlike another--there was no wavering in that decision.

So we believe that because of that deeply held personal belief, that [LTC B] should be excused.

Denying the challenge, the military judge reasoned:

MJ:  [Lieutenant Colonel B], he is clearly willing--excuse me--his initial reaction to the nature of the charged offenses was an understandable visceral reaction. Members are not expected or required to react in a robotic manner.  He is clearly willing to give his decisions a lot of thought.  He does not have a kneejerk reaction to impose a certain sentence.  [LTC B] made it clear, in an extremely credible manner, that he is willing to listen to all of the evidence and will consider the full range of punishments.

[Lieutenant Colonel B] does not believe the death penalty must be imposed.  In fact, in response to a defense question in comparing a life sentence to the death penalty, [LTC B] believes a life sentence may in some ways be more of a punishment than the death penalty because a death sentence will then free the person from having to think about it for the rest of his life.  [Lieutenant Colonel B] is not unalterably in favor of imposing the death penalty.

Viewing all of [LTC B's] responses as a whole, a reasonable person would not conclude that he is biased under the implied bias standard.  The liberal grant standard does not warrant granting the challenge; therefore, the challenge for cause is denied.

We shall not second-guess the military judge's assessment of LTC B as credible; nothing in the record of trial undermines it.  The military judge considered the liberal grant mandate.  In light of LTC B's multiple commitments to consider all

evidence in mitigation, any lawful sentence and the views of fellow members, we conclude the military judge did not err in denying the challenge against him.[22]

## B. MAJOR W[23]

TC: . . . Could you tell us what your views are of the death penalty?

MAJ W:  I do believe that the death penalty is a viable option for anyone who's committed and found guilty of an egregious crime.  I think the question was asked yesterday about children and my views towards that.

TC:  Right.

MAJ W:  And I think it would be a little more difficult for me to, you know being the father of four small children under the age of 10--to have their lives cut short, I think that would--it would be hard.  I mean, I could be fair and objective; but I think that it would be something that I would consider.

TC:  Yes, sir.  But you said that you believe that you could be fair and objective?

MAJ W:  Yes.

---

[22] Our superior court recently emphasized that a member's incorrect—and uncorrected—belief regarding a relevant legal principle is a basis for exclusion. *United States v. Rogers*, 75 M.J. 270, 271 (C.A.A.F. 2016).  Appellant's case is distinguishable, for LTC B's statement that execution would "free [a murderer] from having to be reminded of it" does not constitute an opinion that a life sentence is more severe than the death penalty.  Lieutenant Colonel B's voir dire fully demonstrated his understanding that the death penalty is the most severe sentence under the law.

[23] In group voir dire, MAJ W responded negatively when the defense asked, "[D]o you agree with this statement if someone is convicted of premeditated murder of children they should be given the death penalty?"  He responded positively when asked by defense counsel, "Do you agree with the statement that life in prison is not really punishment for premeditated murder of children?"

TC: Sir, is there any crime that you could think of--to include the premeditated murder of children, is there any crime that you can think of for which you would automatically vote for the death penalty with no other considerations?

MAJ W: Automatically with no other considerations? You know, I would have to hear the evidence and hear what the circumstances were. You know, I understand in our nation we have the option of life in prison or the death penalty, but I think the decision on that would have to be made based on all the evidence at hand. Again, now I think it is a viable option; but it would be dependent on, you know, what the circumstances were--intent, and premeditation and those sorts of things.

So, I mean, I try, you know being a commander for 7 years, I have tried very hard to be fair when I administer UCMJ; hear both sides of every story. I understand that there are extenuating circumstances in some cases. So I try to be very objective and very fair and open about those sorts of things. But I can't think of absolutely automatically death penalty, I would have to hear all of the evidence.

[. . .]

TC: If the defense presents--if they do--they have no burden to present anything of course.

MAJ W: Right.

TC: But if they were to present any extenuation or mitigation, would you be able to also consider that in determining a punishment?

MAJ W: Oh, absolutely.

[. . .]

TC: --you will be instructed that if the accused has been found guilty of premeditated murder by a unanimous vote of all of the members of the panel--

MAJ W:  Right.

TC:  --by a unanimous vote, and the conviction is for premeditated murder, you will then be instructed that you have two choices as to punishment:  one is for confinement for life, the other is the death penalty.

MAJ W:  Uhm-hmm [indicating an affirmative response.]

TC:  Do you understand that you would have those two choices?

MAJ W:  Yes.

TC:  And, sir, do you also understand that there is no presumption in favor of either of those two?

MAJ W:  Correct.

TC:  So with that understanding, would you be able to fairly and completely consider the possibility of either of those?

MAJ W:  Yeah, absolutely.  I mean, that would be in the second phase, and I would worry about that when I got there.

TC:  Right.

MAJ W:  But once I get into the second phase, then I know that we will be briefed by the military judge on what our options are.

[. . .]

TC:  And now can you assure us that you will be able to follow those instructions?

MAJ W:  Absolutely.

TC:  So, if the military judge tells you that you must consider all mitigation and extenuation evidence in addition to everything else, you will be able to follow that?

MAJ W:  Absolutely.

[. . .]

DC:  One of the things that I just want to cover is to put you in a perspective of a case involving--that you have been selected for a panel, as a military court-martial panel.  This hypothetical case--it's not this case.  It's not any particular case, but it's a hypothetical case where you have the responsibility to sentence an accused who has been convicted by proof beyond a reasonable doubt, by a unanimous decision, of premeditated murder.

MAJ W:  Uhm-hmm [indicating an affirmative response.]

DC:  Specifically premeditated murder of a mother and two children, okay?

MAJ W:  Yes.

DC:  Now, in that situation we have also, as a panel in this case, found that the case did not involve--there weren't any facts involving, for example, self-defense.  There was no self-defense.  There was no heat of passion, no provocation.  These were innocent people that were murdered--the victims that were murdered.  There wasn't any mistaken identity.  There's no accident.  There's no defense of others.  None of those things are present.  All that was present was a clear finding of proof beyond a reasonable doubt of premeditated murder, i.e., there's a specific intent to kill.  There's an opportunity to consider that act and it was premeditation--premeditated murder and that was proved beyond a reasonable doubt.

Now, sitting in a panel where there's been a finding of premeditated murder of a mother and two children, what is your feeling of the death penalty as the appropriate penalty for that guilty murderer?

MAJ W:  Again, it is an option.  It is a legal option.  It is, at that point in the game, when we move into the sentencing phase and we receive the instructions from the military judge, that I think it would certainly be an option.

64

DC: Okay, now you understand that the military judge is not going to give you any instructions as to how you should consider whether death is appropriate or not?

MAJ W: Uhm-hmm [indicating an affirmative response.]

DC: That is entirely up to a panel member and their own personal moral judgment. The judge will never give you a checklist or never give you law that says that you must or must not vote for death. Okay. That is a personal judgment. Now, in the context of that personal judgment, what is it that--and remember there's no provocation, intent is proven--it's beyond a reasonable doubt, that there was an intent to kill and there was the actual killing of a mother and two innocent children. What else would be important to you in making that decision?

MAJ W: As far as the death penalty--

DC: Yes.

MAJ W: --what else?

DC: Yes, as far as the death penalty being important?

MAJ W: Well, again, it's like what I mentioned earlier, it's the circumstances that lead up to it. I mean, certainly murder is probably in my mind one of the most heinous crimes there is and life in prison versus the death penalty is--that both are viable options for sentence. However, I think what would sway me one way or the other are the circumstances around it.

DC: Okay.

MAJ W: The premeditation would be part of it; perhaps the ferocity of it or whatnot, you know; and for me personally, I mean having, you know, four children of my own under the age of 10, you know, the killing of children would be difficult, would make me think of the death penalty; but at the end, it would depend on all of the evidence and the circumstances behind it.

DC:  Okay. And by circumstances behind it, just so I understand what you are talking about, you talked about premeditation--obviously you would want to know that it was a premeditated killing?

MAJ W:  Yes.

[. . .]

DC: . . . [Y]ou believe that the finding or part of that consideration that would be important would be the premeditation, the finding of premeditation?

MAJ W:  Part of it would be the premeditation, part of it would be the evidence that's presented. I mean, you know, if it's beyond a reasonable doubt, they are found guilty, and there's a unanimous jury that says, yes, absolutely this person did this--

DC:  Right.

MAJ W:  --I would definitely look personally I would look at all of the evidence and try to keep it as--to be as objective as possible.

DC:  Okay.

MAJ W:  But I certainly think premeditation and the ferocity and those sorts of things would play into my mind.

DC:  Okay.  And when we talk about the circumstances, I understood you were talking about, like, the acts of the violence in the offense itself; is that what you are referring to or is there something else?

MAJ W:  No, that is what I am referring to.

DC:  And so the events that lead up to the act of violence and the nature of that violence and whether it was accompanied by the necessary premeditated intent, that is what you are talking about as to the factors you would consider as to whether you determine death is the appropriate punishment?

MAJ W:  I believe so, yes.

DC:  Is there anything else that would be important to you personally?

MAJ W:  To consider death as an option?

DC:  Yes.

MAJ W:  I think, I mean, those are the major things. I mean, it is a viable option of the death penalty; and I think what would probably sway me more towards that is the premeditation part and the ferocity of it.  You know, I think that would be one of the things that I would consider.

DC:  Okay. So as I understand and just so I can get it clear in my mind is that if you were to find beyond a reasonable doubt--you and a panel unanimously determine beyond a reasonable doubt, that there was premeditated murder of children--

MAJ W:  Uhm-hmm [indicating an affirmative response.]

DC:  --and that it was done in a violent way, with just great disregard for all human life. And it was done in a violent way that was upon those children, that that would be a case where you are inclined to view death as the appropriate punishment for that crime?

MAJ W:  That is correct.

[. . .]

DC: . . . [W]hen we had the discussion about--first of all, in a case obviously not everybody as I indicated yesterday, not everybody has the same views, and we would expect that of panel members.

MAJ W:  Right.

DC:  And some people have different views, based upon their own personal background and their own personal situation; and of course, you indicated earlier that this is

an especially difficult thing, when we are talking about the death penalty, for you because of the fact that you have children--

MAJ W:  Uhm-hmm [indicating an affirmative response.]

DC:  --and that is something that's on your mind. And so that is a different case, obviously, than a murder of an adult which I believe you indicated would not present as much of a moral difficulty for you as it does with children?

MAJ W:  I think that's a true statement.

DC:  Okay.

MAJ W:  I don't think that the murder of children automatically would make it a death-penalty offense, but it would definitely sway me to consider it more.

DC:  Okay. And one of the other aspects of that, of course, is the discussion about--you said considering the nature of the offense, the premeditation, and so forth. Now, again, you understand that even before a panel would be permitted to even consider death as a possible punishment, there would have to be a finding of guilty beyond a reasonable doubt of premeditated murder?

MAJ W:  Right.

DC:  Okay. And that if there was no finding of premeditated murder, then there would never be a consideration of death as a potential sentence. Do you understand that?

MAJ W:  Yes.

DC:  And within the context of that though, you had indicated that not only that the premeditation was important but also the circumstances surrounding the offense itself?

MAJ W:  Uhm-hmm [indicating an affirmative response.]

DC:  And correct me if I am wrong, but I understood you to say that that's your--that's the important factors to you in consideration of death as an appropriate punishment?

MAJ W:  Yeah, if--hypothetically, if it was a unanimous decision that there was guilt beyond a reasonable doubt and the death penalty was an option, yes, I would weigh many factors into it and one of them is the premeditation. As I said, one of them would be the ferocity of the crime; and you know those would be primarily, you know, what I would be looking at.

DC:  Okay. And in order to explain or to make sure we understand your views, what other things might be of importance to you?

MAJ W:  For?

DC:  In making a consideration, along with those factors, what other things might be important to you with regards to the imposition or decision as to whether death or life in prison is the appropriate punishment?

MAJ W:  I think one thing that would be important to me is remorse.  You know, in part of my job when I, you know, see patients, I have seen people have--you know, do things and, you know, have affairs or whatnot that they have admitted to and they have no remorse over it. Other people are devastated, and I know that there are different personalities of people in the world. I know there's different ways people think and act and do, but I think remorse would be one of those factors too.
DC:  And if you were--are there any other factors that come to mind that you would consider important?

MAJ W:  Well, I mean, it was mentioned earlier, the background of the person.  If a person would have--I mean, I would consider the background of a person. You know, we mentioned that, you know, perhaps if they have had a long crime record of, you know, serious crimes and stuff like that and then murder was brought on there. Would that play a factor?  Possibly, but it would really depend on the circumstances behind it.

DC: Okay. And in that respect, if you were to--you know again, in the case of premeditated murder of children done in a violent way, if you were to receive information about the person's background that wasn't necessarily negative but was favorable, i.e., they lived life without committing any crime or violent crimes up to the point of the offenses themselves. Would that be something that you would consider important?

MAJ W: I would consider it, but it would really depend on--you know, it would depend on the circumstances honestly in my mind. Good people can sometimes snap and do horrible things; but if people, you know, got out with an honorable discharge a lot of people get out with an honorable discharge. If someone was a, you know, hero or whatever, you know, that might play into it; but really it's the facts at hand of the case that is important to me. You know, so I would consider it, but I don't think the background would sway me one way or another towards or against the death penalty. But again, it would really depend in my mind what background information is presented.

DC: Okay. In my hypothetical situation and I would draw you back to it again--

MAJ W: Uhm-hmm [indicating an affirmative response.]

DC: --I had told you that, you know, it was premeditated murder, a finding beyond a reasonable doubt of children was done without any finding of--there wasn't any mental health issues, there's no defenses, there's no raising of insanity, and there's no alcohol or drug involvement. All of those things were eliminated prior to a finding of premeditated murder. Okay?

MAJ W: Okay.

DC: With that understanding, is that what you were talking about with regards to the background that you know, absent that kind of background, that your starting point or your inclination is that death would be the appropriate punishment for the murder of a child?

[. . .]

MJ:  Before we get to that question, let me ask you a question, [MAJ W].

MAJ W:  Yes, sir.

MJ:  Based on the scenario by defense counsel that you, in fact, found someone guilty in a unanimous decision of this murder he has described including two little children.  Are you going to make up your mind as to what is an appropriate sentence that should be imposed before you hear all of the evidence that would be presented on sentencing?

MAJ W:  No, sir.  I would wait to hear all of the evidence before I would make up my mind on anything.

MJ:  Okay. With that in mind, [DC], you may continue.

DC:  [MAJ W], without making up your mind, would you, under those circumstances where there's a finding beyond a reasonable doubt, et cetera, and none of those defenses are present and it's a heinous crime, and the murder of two children---

MAJ W:  Uhm-hmm [indicating an affirmative response.]

DC:  --would you be in a position, just in your processing of starting at a position where you are inclined to say death is the right answer and then look for mitigation factors, is that how you would approach it?

MAJ W:  Most likely, yes.

DC:  One of the things that we had touched a little bit on yesterday, but I want to just cover it a little more in depth with you personally--

MAJ W:  Okay.

DC:  --one is that--and I think that you understand that the law never requires anyone, any particular panel member to vote for death.

MAJ W:  Uhm-hmm [indicating an affirmative response.]

DC:  And you would agree with that?

MAJ W:  I would.

DC:  And that the judge nor any law that he would read you or any requirement of anything that you would receive in this court would ever require you or any other member to vote for death.

MAJ W:  Okay.

DC:  And that the decision as to whether the appropriate punishment for a qualified offense is life or death is a personal one, one that is individual to each juror.  Do you understand that?

MAJ W:  I do.

DC:  And that the decision to extend mercy or to find or not find a mitigation factor is sufficient to give a vote of life, is personal to each individual panel member?

MAJ W:  Correct.

DC:  Okay.  And that a panel member could decide to vote for life based upon something that they heard in the courtroom or something that they brought in with them.  Does that make sense?

MAJ W:  It does.

DC:  Their own personal sense of what is right, what is moral, what is merciful, what is just can be anything that is either presented in a courtroom or brought in by that person.  Does that make sense also?

MAJ W:  Yeah, it does.

DC:  And that once a person makes that decision, that panel member or that person is entitled to have that decision respected.  Would you agree with that?

MAJ W:  I would.

DC:  So that when you would make a decision about your own personal moral judgment, you would expect that your opinion would be respected by others, would you not?

MAJ W:  I would.

DC:  And if somebody else expressed an opinion or didn't express any opinion at all but voted in that regard, you would respect their opinion, correct?

MAJ W:  Absolutely, sir.

DC:  And when the individual who is making that personal moral judgment you would expect that they wouldn't be subjected to any bullying or intimidation to try and change their personal moral views, would you?

MAJ W:  No, sir. I wouldn't have trouble with anybody here.

DC:  Well, I'm not talking about you. But you wouldn't expect that they would. In fact, you wouldn't tolerate it, would you?

MAJ W:  No, sir.

DC:  And you wouldn't allow anybody to attempt to bully or intimate you to change your own personal moral view?

MAJ W:  No, sir.

DC:  Likewise the understanding that you wouldn't necessarily be required or wouldn't feel required to explain your personal moral judgment to anybody, would you?

MAJ W:  No, sir.

DC:  And you wouldn't expect anybody to explain their own personal judgment once they make that moral decision themselves, would you?

MAJ W:  Correct.

[. . .]

TC:  [Major W], just a very quick follow-up. With regard to the questions about the hypothetical that was posed earlier when the defense counsel was talking to you, you understand that that is just a hypothetical?

MAJ W:  Yes.

TC:  And you understand, as we discussed earlier when I was up here talking to you, that you are to wait and weigh the facts that are presented in court?

MAJ W:  Correct.

TC:  And you agreed earlier when I was asking you questions that you would, in fact, wait until everything is presented?

MAJ W:  Yeah, absolutely.

TC:  And that you would follow the instructions from the military judge in determining an appropriate sentence?

MAJ W:  Absolutely.

TC:  And that you would be able to--in fact, let me ask you again, can you assure the court that you will be able to consider everything that's presented by both sides in reaching a conclusion?

MAJ W:  Yes, I can.

TC:  And with regard to the background of the accused, I think there were some questions about good stuff and bad stuff that may be presented as to the background of the accused. You don't know, at this point, what those facts are?

MAJ W:  No, I do not.

TC:  So is it possible for you to evaluate how much weight you would give to the accused's background at this point?

MAJ W:  I mean at this point I can't hypothesize what I don't know.  So I don't know. I mean, I know a little bit about this case from, you know, the paper but not enough to go into any kind of intelligent discussion.

TC:  So it's impossible for you to do that at this point?

MAJ W:  Right. You know, what happens in here is what I'll base all of my judgment and my deliberation on.

TC:  Okay.  And you will keep an open mind until the end?

MAJ W:  Absolutely.

The defense challenged MAJ W for cause, "based upon implied bias standard as well as the baseline of the liberal grant mandate."  The defense emphasized MAJ W was the father of four children, and his statement that he would consider, *inter alia*, the "ferocity of the crime" in considering the appropriate punishment for premeditated murder.  The defense also emphasized MAJ W's statement that in a case involving the premeditated murder of children, he would "start at the death penalty and would need to be presented some sort of mitigation to convince him otherwise.  That is a clear statement of a burden-shifting requirement . . ."

Describing MAJ W as "very credible," the military judge denied the challenge, reasoning:

MJ: . . . While he believes the death penalty is an option for an egregious crime, and the decision becomes more difficult when children are the victims, he is clearly willing to hear all of the evidence, to include the background of the accused, before making a decision.  He could not think of a case in which he would automatically impose the death penalty.  While he is willing to consider all the evidence, he cannot say at this point, and is not expected to be able to say, how much weight he would give to any particular evidence.  As he said, he cannot hypothesize what he does not know.

Now, in response to the graphic scenario presented by the defense counsel, [MAJ W] said he may start with the death

75

> penalty; however, he is not unalterably in favor of the death penalty. And, as he said, he could not think of any case in which he would impose the death penalty.
>
> In light of all of his answers, it is clear that [MAJ W] has not made up his mind as to an appropriate sentence. And, based on all of his responses, a reasonable person would not conclude that he is biased.
>
> The liberal grant mandate does not warrant a challenge for cause and, therefore the challenge for cause is denied.

We shall not second-guess the military judge's assessment of MAJ W as credible; nothing in the record of trial undermines it. The military judge considered the liberal grant mandate. Where a panel member demonstrates an "inelastic disposition concerning an appropriate sentence," the military judge should grant that challenge. *United States v. Clay*, 64 M.J. 274, 276 (C.A.A.F. 2007). However, MAJ W's voir dire revealed no fixed or "inelastic" disposition "regarding" punishment. In light of MAJ W's multiple commitments to consider all evidence in mitigation, any lawful sentence and the views of fellow members, we conclude the military judge did not err in denying the challenge against him.[24]

### C. LIEUTENANT COLONEL W[25]

Lieutenant Colonel W described his previous experience as a civilian law enforcement officer, and the defense asked him about his assessment of defense attorneys:

---

[24] Considering *Walton v. Arizona*, 497 U.S. 639, 650 (1990), we find unpersuasive appellant's argument that MAJ W's views inappropriately shifted the burden to present mitigation evidence. ("So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.") (*rev'd on other grounds*, *Ring v. Arizona*, 536 U.S. 584 (2002)).

[25] In group voir dire, LTC W responded negatively when defense counsel asked, "[D]o you agree with this statement if someone is convicted of premeditated murder of children they should be given the death penalty?"

DC:  As a result of that aspect of your career, meaning the help and assisting and processing of a crime scene, do you ever recall being called as a witness with regards to a crime scene that you had processed or evidence that you had helped process?

LTC W:  Yes. I've been to hearings; but on the major crime scenes, no, I wasn't called as a witness.

DC:  So you've been--with regard to, for example, maybe some sort of suppression hearing or some other type of evidentiary hearing, prior to a trial you may have been called?

LTC W:  Yes.

[. . .]

DC: . . . In your time as a law enforcement officer, did you have regular contact with prosecuting attorneys?

LTC W:  Yes, on occasion.

DC:  And it would be, obviously, on cases that you had worked, made an arrest or made some other type of evidence that they needed to talk with you?

LTC W:  That's it.

DC:  Did you come in contact with defense attorneys?

LTC W:  Yes.
DC:  In general, what was your impression over the years of prosecuting attorneys in general?

LTC W:  Good.

DC:  Okay.  And what was your opinion or what kind of impression was left to you of the defense attorneys that you came in contact with?

LTC W:  The ones I came in contact with, some good, some not so good.

DC:  Okay. What was it about that that left you with an impression of some of them that wasn't so good?  What kind of things were left with you in your mind?

LTC W:  When I was an arresting officer and I was the one that was sitting on the stand, the defense--mainly on DUI cases just the way the defense handled officers as witnesses.

DC:  And what was it about--I know it's been a long time, but what was it about the way the officers were treated that struck you as leaving a negative impression in your mind about defense attorneys?

LTC W:  I think the defense had a lot of latitude--were allowed a lot of latitude in some of the cases.

DC:  By latitude, I'm not sure I understand what you mean in that context.

LTC W:  I guess, maybe with the line of questioning or the inferences that they were making toward the officer. I'll use my experiences.  On DUI cases, I saw a handful of times that I had made arrests and maybe the Intoxilyzer results weren't admissible at the time.  So the jury couldn't see the results of the Intoxilyzer.  So, as somebody that was trained by the state on DUI detection, there was a lot of questions that were brought up about my expertise as somebody that can make decisions on DUI detection.  So it would bring a lot of doubt into the jury on my abilities as an officer and other officers, the same thing.

DC:  And so I understand, because of your knowledge of the case, you felt there was some unfairness in the system as far as what they allowed the defense attorney to ask and didn't allow the prosecutor to ask?

LTC W:  I think that what they were allowed to ask was fine, it was just the way it was shaped with the jury and what was not allowed as evidence was some of the things that didn't sit well with me at that time.

78

The defense challenged LTC W for cause, citing implied bias and the liberal grant mandate with respect to his experience as a law enforcement officer. Then, focusing on his voir dire answers regarding defense attorneys, the defense additionally asserted actual bias:

> [Lieutenant Colonel W] stated that while he had an unfailingly good view of prosecuting attorneys--he didn't have anything negative to say about them--he had some negative comments about defense attorneys, specifically the way defense attorneys approached law enforcement witnesses on the stand and that when defense attorneys would ask questions that he viewed unfair, based upon his prior knowledge of the case, he held that against defense attorneys, specifically about evidence that may have not-- would be suppressed or otherwise not a part of the case, that he viewed that it would be on. No such--obviously, no such negative views toward prosecutors.

Finding LTC W "very candid and credible," the military judge denied the challenge and addressed this point:

> [Lieutenant Colonel W] may have thought that some defense counsel were good and some were not so good. There is absolutely no evidence he harbors any ill feelings against defense counsel as a whole and absolutely no evidence that he harbors any ill feelings against defense counsel in this case.

We shall not second-guess the military judge's credibility assessment of LTC W; nothing in the record of trial undermines it. The military judge considered the liberal grant mandate. Additionally, nothing indicates that LTC W's opinions of individual defense attorneys in particular civilian proceedings somehow caused him to develop a stereotypical view of defense counsel, and we conclude the military judge did not err in denying the challenge against him.

**VII – C.   THE MILITARY JUDGE ERRED IN FAILING TO SUA SPONTE VOIR DIRE AND REMOVE THE PANEL MEMBER WHO, BEFORE THE CONCLUSION OF THE GOVERNMENT'S CASE ON FINDINGS, ASKED DETECTIVE [JW], A GOVERNMENT WITNESS, "WHAT DO YOU THINK SGT [SIC] HENNIS'S MOTIVE WAS?"**

Detective JW, of the Cumberland County Sheriff's Office, testified during the government's case.  After his testimony, but before excusing him from the stand, the military judge—as is customary and allowed in military trials—asked the members whether they had any questions.  Colonel (COL) CT wrote the proposed question of which appellant complains.

The parties reviewed COL CT's proposed written question, and defense counsel wrote on the question form, "Obj[ection] calls for speculation."  The military judge did not allow the question, and the trial continued.  Appellant did not request voir dire or any other follow-up regarding this proposed question.

Now, appellant argues the military judge "erred in failing to voir dire and ultimately remove" COL CT.  Relying heavily on *United States v. Nash*, 71 M.J. 83, (C.A.A.F. 2012), he argues COL CT's question established actual bias. Alternatively, appellant asserts the question constituted evidence of implied bias. Without restating the standards surrounding each basis for exclusion, described *supra,* we reject both arguments.

We recognize the military judge's authority to question and, if necessary, remove a panel member even without a party's request to do so.  Rule for Courts-Martial 912(f)(4) provides: "Notwithstanding the absence of a challenge or waiver of a challenge by the parties, the military judge *may*, *in the interest of justice*, excuse a member against whom a challenge for cause would lie."  (Emphasis added); *see also United States v. Strand*, 59 M.J. 455, 458 (C.A.A.F. 2004) ("It is clear that a military judge may excuse a member sua sponte.").

The standard of review for a case under these facts is unclear.  In *Strand*, our superior court stated that a "judge's decision whether or not to excuse a member sua sponte is subsequently reviewed for an abuse of discretion," but then held "[s]ince the judge did not abuse his discretion, there was no plain error."  *Id*. at 458, 460. Applying the most rigorous standard of review applicable to questions of member bias—more deferential than de novo, but less deferential than abuse of discretion, under *Woods*—we hold the military judge did not err by not questioning or removing COL CT.

We regard COL CT's question as an effort to probe the strength of the government's case, not a premature conclusion that appellant was guilty. Finding no actual bias or a violation of R.C.M. 912(f)(1)(M), we address whether COL CT should have been excused for implied bias under R.C.M. 912(f)(1)(N). We review this issue through the eyes of the public and ask whether his question regarding motive undermined the public's perception or appearance of fairness of the military justice system. *See United States v. Townsend*, 65 M.J. 460, 463 (C.A.A.F. 2008).

Noting the defense's emphasis in its closing argument on appellant's apparent lack of motive, we return to our observation that trial defense counsel did not object to COL CT's continued service on the panel after reading his proposed question. From these facts, we infer the trial defense team may have perceived COL CT as potentially receptive to that aspect of the defense case and, therefore, wanted him to remain on the panel. In our view, no member of the public could reasonably conclude that COL CT's question indicated a lack of fairness in the proceedings.

### VII – D. THE VARIABLE SIZE OF THE COURT-MARTIAL PANEL CONSTITUTED AN UNCONSTITUTIONAL CONDITION ON MASTER SERGEANT HENNIS'S FUNDAMENTAL RIGHT TO CONDUCT VOIR DIRE AND PROMOTE AN IMPARTIAL PANEL.

Considering the record of trial and matters asserted in the parties' briefs, we conclude this assignment of error merits neither discussion nor relief.

### VIII – A. TRIAL COUNSEL'S REPEATED AND IMPROPER COMMENTS AND ARGUMENTS PREJUDICED MASTER SERGEANT HENNIS' RIGHT TO A FAIR TRIAL.

In his brief, appellant organizes his allegations regarding government counsel's comments into four groups, which we address seriatim:

> A. *"Trial counsel made highly prejudicial, belligerent remarks toward MSG Hennis' defense counsel."*

Appellant focuses on several of government counsel's comments during his rebuttal findings argument, including remarks describing the defense's closing argument as "monstrous" and "evil." We do not condone them; however, their context is relevant. *See Darden v. Wainwright*, 477 U.S. 168, 179 (1986). In his closing argument, civilian defense counsel said, *inter alia*, the following:

81

> [I]n your deliberations, you are to rely on your knowledge
> of human nature and the ways of the world.  One of the
> ways of the world and one of the things that we know
> about human nature is that things can occur spontaneously
> and for no significant reason.  A young Soldier [appellant]
> whose wife had just had a baby recently; a Captain's wife
> [Mrs. KE] while the Captain has been away for a long
> time.  All I'm asking is:  Is it possible that something
> occurred independent of the murders, independent of the
> night of the 9th of May that can answer the unanswered
> questions?
>
> [. . .]
>
> I want you to consider that the government has created an
> inference by their own argument that . . . [appellant] went
> to the [E family] home, seeking sex with [Mrs. KE].
> Listen to me close right now--what I'm about to say--and
> I'm going to repeat it.  The evidence in this case--if he
> were charged with adultery--and let's just take away the
> murders.  Let's just focus on the DNA.  That evidence
> could support an argument of adultery.  Adultery could be
> --could have occurred in this case.
>
> [. . .]
>
> You have to ask yourselves, if you take that evidence and
> if the rational hypothesis is that some form of consensual
> sex occurred within 2 days or 3 days of the murders, then
> that explains how it [appellant's spermatozoa] was found
> because there is no date/time stamp.  Has the government
> disproven that beyond a reasonable doubt?  Does the
> evidence take you beyond adultery to murder?

After the defense's closing argument, the military judge convened an Article 39(a), UCMJ, session at the government's request.  Referring to a previous Article 39(a), UCMJ, session on 8 May 2009, discussed *supra*, regarding assignment of error IV, government counsel argued that civilian defense counsel had represented to the court that no sex, consensual or otherwise, had occurred.  Relying on *United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984), the government then asked to re-open its case and offer a portion of the previous Article 39(a), UCMJ, transcript against appellant as an adoptive admission.  The military judge denied the request and recalled the members to hear government rebuttal, which included the following:

> Now, you saw evil and you hear an evil argument this morning. It's not enough that [Mrs. KE] was murdered. The defense wants you to believe she cheated on you, [GE]. She committed adultery. That's what the defense wants you to believe. That is a vile, disgusting, offensive argument. The defense said you don't know [Mrs. KE]. There's a reason for that, because [appellant] killed her 25 years ago. You can't know her now, can you? Not unless you can pray and talk to her in your prayers. Unless you can hold a séance, you can't know her because she's been dead for 25 years.
>
> [. . .]
>
> And there is absolutely no evidence whatsoever before you that [appellant] had consensual sex with [Mrs. KE]. That is a vile, disgusting argument; and it is designed to try to plant doubt. It is designed to get you off the ball, to get you off the game. It gets you so shook up about the "should have, could have, would have" world that criminals live in to prey on some sort of doubt that's not reasonable but anything is possible so that you can get away from the main facts of this case . . . . When you're desperate, you got to go for the Hail Mary.

Because the defense did not object to this portion of government counsel's argument, we review for plain error. "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citing *United States v. Rodriguez*, 60 M.J. 87, 88-89 (C.A.A.F. 2004)). The government urges in its brief that these remarks were a fair commentary on the defense *argument* and not an impermissible critique of defense *counsel*. Under the circumstances here, this distinction is unpersuasive. We note and do not condemn government counsel's argument to the military judge during the Article 39(a), UCMJ, session that civilian defense counsel's argument, in light of his previous representation to the court, was an example of "sharp practices." However, government counsel's subsequent characterization of the defense argument as "monstrous," "evil," "vile," and "disgusting" constituted plain and obvious error.

Despite these remarks, we conclude under the circumstances of this case they did not materially prejudice appellant's right to a fair trial. In cases of improper argument we assess whether prejudice exists by examining and balancing three factors: (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction. *Fletcher*,

83

62 M.J. at 184; *see also United States v. Frey*, 73 M.J. 245, 249 (C.A.A.F. 2014); *United States v. Halpin*, 71 M.J. 477, 480 (C.A.A.F. 2013) (applying the same). Under the first *Fletcher* factor, we note the objectionable statements were isolated and not a predominant part of government counsel's argument. Under the second factor, while the military judge did not intervene sua sponte, he did instruct the members that counsel's arguments were not evidence, instead charging the panel to "base your determination of the issues in this case on the evidence as you heard it and the law as I instruct you." Turning to the third factor, the evidence against appellant was strong: a witness identified him as the person parked near the E family home at midday on 9 May 1985; a witness identified him as the person he saw leaving the E family home in the early morning hours of 10 May 1985; another witness identified him as the person she saw at an automated teller machine (ATM), at the same time and place where the E family's missing card was used after the murders; multiple witnesses described appellant burning a substantial fire in a barrel at his home for several hours on 11 May 1985; and, DNA analysis identified appellant as the source of the sperm obtained from Mrs. KE's body. We are confident the weight of the government's evidence "reduced the likelihood that the [panel's] decision was influenced by argument." *Darden*, 477 U.S. at 182.

    *B. "Trial Counsel instructed the panel that they were the conscience of the Army and they needed to send the world a message, compared motive to terrorist attacks, and improperly vouched for the reliability of the DNA."*

Responding to the defense's emphasis in closing argument on appellant's apparent lack of motive, government counsel rebutted with several rhetorical questions, including: "Why would someone fly a plane into a building? Why would someone take a weapon in a military installation and start firing it?" The defense did not object. Government counsel later said, "the Army believes in DNA." The military judge sustained the defense's objection to this statement. Then, saying "DNA is good enough" to verify the identity of a deceased person, government counsel rhetorically asked, "why is DNA not good enough to identify a murderer?" The defense did not object. Later, government counsel argued:

> [Civilian defense counsel] talked about the conscience of the Army. You are the conscience of the Army.[26] Well, let me tell you something. Verdicts in courts-martial around the world send a message, and they reflect how our Army, our military values things. What is acceptable behavior and what is unacceptable behavior.

---

[26] In his closing argument, civilian defense counsel said to members, "[C]ollectively you represent . . . the conscience of the Army . . ."

The defense objected, citing "the appearance of unlawful command influence." The military judge sustained the objection, instructing government counsel to refrain from mentioning "Army Values."

We perceive no plain or obvious error in government counsel's "conscience of the Army" remark; indeed, it appears trial counsel was merely restating the defense's innocuous characterization of the panel. We also find no plain or obvious error in government counsel's reference to various purposes for DNA analysis.

We do, however, find plain and obvious error in government counsel's comparison of this case to one in which a terrorist flies a plane into a building or an active shooter targets a military installation. Counsel may urge a factfinder to draw inferences based *only* on the evidence at hand and the law applicable to the case. In this instance, government counsel strayed from that basic principle, and the military judge should have intervened. Applying *Fletcher* again, we conclude these remarks of this type were isolated and note the military judge's instruction regarding the limited purpose of counsels' arguments. Finally, considering the strength of the evidence supporting the findings, we are confident these remarks did not sway the panel's deliberations.

Assuming arguendo government counsel created an appearance of unlawful command influence by conflating the members' verdict and "Army Values," we find the military judge properly remedied it with his ruling on the defense objection. We also find sufficient the military judge's sustaining the defense objection to government counsel's argument that "the Army believes in DNA." We further note, with respect to these two matters, the defense neither requested a curative instruction nor moved for a mistrial.

### C. "Trial counsel made derogatory comments concerning [appellant's] fundamental right to present mitigation."

During the sentencing case, the defense admitted multiple photographs of appellant and his family members. In sentencing argument, government counsel, the following occurred:

> TC: Consider the aggravation in this case up against the mitigation and extenuation. Consider what you heard yesterday. And I ask you this, *how dare they* ask you to look at pictures of [appellant] opening presents with his kids in front of a Christmas tree?

> DC: Objection, Your Honor.

> MJ:  Members, the defense is allowed to present matters in extenuation and mitigation.  You must give them due consideration.  You may proceed.
>
> TC:  *How dare they* ask you--they're allowed and you can consider it and should give it its appropriate weight.  *How dare they* ask you to look at pictures of [appellant] sitting on the couch reading a book to his kids?
> (Emphasis added.)

We held in *United States v. Carr*, "it is inappropriate that any party to a court-martial should be allowed to profit, directly or indirectly, by argument on findings or sentence regarding an exercise of a constitutionally protected criminal due process right."  25 M.J. 637, 639 (A.C.M.R. 1987).  "Whether there has been improper reference to an accused's invocation of his constitutional rights is a question of law that we review de novo."  *United States v. Moran*, 65 M.J. 178, 181 (C.A.A.F. 2007) (citing *United States v. Alameda*, 57 M.J. 190, 198 (C.A.A.F. 2002)).  We find government counsel's use of the phrase, "how dare they," improperly derogated appellant's right, guaranteed by the Sixth and Eighth Amendments to the Constitution, to present extenuation and mitigation evidence.  Noting the defense did not object after government counsel's second and third use of this phrase, we nonetheless find such use plainly and obviously improper.

Evaluating prejudice in the context of this constitutional error, we note the exacting standard announced by our superior court:

> "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."  This will depend on "whether there is a reasonable possibility that the evidence [or error] complained of might have contributed to the conviction."

*Moran*, 65 M.J. at 187, (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967) (internal citation omitted) (emphasis added)).  This principle applies with equal force to a presentencing hearing.

First, we observe government counsel's poor phraseology occurred during a brief portion of a nineteen-page sentencing argument which was otherwise proper, focusing on the relative weight which the government argued the panel should give the evidence in aggravation, extenuation and mitigation.  We also note the military judge's multiple and clear instructions, including his sua sponte instruction described *supra*, emphasizing appellant's right to present evidence in extenuation and mitigation and the members' duty to consider it.  Finally, the properly-admitted

aggravation evidence in this case was exceptionally strong, depicting the calculated and brutal slaying of multiple victims, two of whom were defenseless young children. We are convinced beyond a reasonable doubt that government counsel's erroneous argument was harmless.

### D. "Trial counsel asked the panel to place themselves in the shoes of the victims and victims' relatives."

Relying primarily on *United States v. Shamberger*, 1 M.J. 377 (C.M.A. 1976), and its prohibition of "Golden Rule" arguments which seek to place the factfinder in the position of a victim, appellant complains of additional lines of government argument on findings and sentencing. For example, government counsel said the following of Mrs. KE during rebuttal findings argument:

> You have to think, what's going on in her mind? "Oh my God, my husband's [sic] not here. Help is not on the way. I've got to protect my children. Do anything you want to me, but save my children. I will submit. I'll do anything, but please save my children."

Appellant now argues government counsel erred in asking the panel to "imagine" several aspects of the murder scene. For example, the following occurred during sentencing argument:

> TC: Imagine the mental anguish of [Mrs. KE]. There was no forced entry in the house but, at a certain point, once the accused was inside there, probably using the dog to gain entry--something about the dog somehow gaining entry into the house. At a certain point, [Mrs. KE] had to realize that she was in trouble. Imagine the mental anguish of this woman, 120 or so pounds, and this 6-foot-4 man in her house now with her three small daughters there and her husband definitely not coming home, away at school. Imagine the mental anguish as that situation develops. And she was eventually bound and she was eventually raped. Imagine the fear--
>
> DC: Objection, Your Honor. He is inappropriately attempting to place the panel in--it's an improper argument.
>
> MJ: You may not place the members into the shoes of the victims.

TC:  Yes, Your Honor.  The fear that [Mrs. KE] must have felt for her children, knowing that they were just a room away is extreme mental anguish.

When you're considering pain and suffering, remember the defensive wounds that [Miss KE] had on her body and that [Mrs. KE] had on her body.  Remember the details presented by the medical examiners about the injuries suffered by the children, the physical attacks on the children.

You'll have the autopsy reports.  You have those in evidence, one each for the three victims.  And you had the testimony from the medical examiners.  They talked extensively, as the reports do, about the wounds, the stabbings; each child stabbed 10 times, [Miss EE] with 5 of those stabbings in the back.  None of those wounds caused instant death.  There was pain, and there was suffering by each of those victims.

We don't know in that master bedroom which--between [Miss EE] and [Mrs. KE]--which was killed first.  We don't know.  But either scenario is almost too horrific to imagine.  Either little [Miss EE] was murdered first while her mother was bound and forced to watch, or [Mrs. KE] was murdered first in front of her 3-year-old child.

And little [Miss KE] in her bed down the hall under her blanket--age 5, at the age where your parents tell you monsters aren't real.  And when you're 5 and you lay in bed and you close your eyes and hide under the blanket thinking I can't see them so they can't see me.  Imagine the screams.

There can be no doubt that there was pain and suffering by all three of these victims, emotional and physical.

Neither these arguments nor the others of which appellant now complains violated the "Golden Rule" principle.  We so conclude, noting our superior court's observation in *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000):

[W]e also recognize that an argument asking the members to imagine the victim's fear, pain, terror, and anguish is permissible, since it is simply asking the members to

> consider victim impact evidence. *See, e.g., United States v. Holt*, 33 M.J. 400, 408-409 ([C.M.A.] 1991). Logically speaking, asking the members to consider the fear and pain of the victim is conceptually different from asking them to put themselves in the victim's place. *See United States v. Edmonds*, 36 M.J. 791, 793 ([A.C.M.R.] 1993).

Under the circumstances of this case, including the lone surviving child's testimony at trial that she had no memories of her mother or sisters, we conclude government counsel fairly and properly asked the members to consider and "imagine" the victims' emotional and physical pain and suffering at appellant's hands. We further find government counsel's arguments regarding the impact on other surviving family members consistent with the cases cited *supra*.

### VIII – B. THE MILITARY JUDGE ABUSED HIS DISCRETION WHEN HE PERMITTED THE GOVERNMENT TO ADMIT AGGRAVATION EVIDENCE IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Considering the record of trial and matters asserted in the parties' briefs, we conclude this assignment of error merits neither detailed discussion nor relief. The aggravation evidence admitted in this case was well within the constitutional safeguards described in *Payne v. Tennessee*, 501 U.S. 808 (1991).

### VIII – C. THE MILITARY JUDGE ERRED WHEN HE DENIED MASTER SERGEANT HENNIS' MOTION TO SET ASIDE THE CAPITAL REFERRAL DUE TO THE DESTRUCTION OF OVER THREE YEARS OF INMATE RECORDS.

Considering the record of trial and matters asserted in the parties' briefs, we conclude this assignment of error merits neither discussion nor relief.

### VIII – D. THE MILITARY JUDGE ERRED WHEN HE INSTRUCTED THE PANEL THAT THEY NEEDED TO CONTINUE TO VOTE UNTIL THEY REACHED EITHER ELEVEN VOTES FOR LIFE OR FOURTEEN VOTES FOR DEATH.

During sentencing deliberations, the panel members submitted the following question to the military judge:

> If there is one person who votes against the death penalty
> does that mean that all other votes are for a life sentence?
> i.e. does this automatically fulfill a confinement for life
> sentence considering a 3/4 concurrence (understanding
> para. 3, pg 21)?[27]

After granting a recess in the panel's deliberations, the military judge heard extensive argument[28] from the parties regarding the correct response.[29]

---

[27] The parenthetical phrase referred to the portion of the written sentencing instructions, informing the panel that a three-fourths concurrence was required in order to sentence appellant to confinement for life.

[28] The defense correctly noted to the military judge that the Military Judge's Benchbook states that only one vote may be taken on the death penalty. Dep't of Army, Pam 27-9, Legal Services: Military Judges' Benchbook [hereinafter Benchbook] para. 2-7-18 n.1 (1 Jan. 2010). This Benchbook provision is incorrect as a matter of law. *See* R.C.M. 1006(d)(3)(A).

[29] Urging the military judge to ask the members whether they had voted on the death penalty so that he might then instruct them that only one vote thereon was allowed, the trial defense team relied heavily on the following passage from *United States v. Simoy*, 50 M.J. 1, 2 (C.A.A.F. 1998):

> In order for the death penalty to be imposed in the
> military, four gates must be passed:
>
> (1)  Unanimous findings of guilty of an offense that
> authorizes the imposition of the death penalty, R.C.M.
> 1004(a)(2);
>
> (2) Unanimous findings beyond a reasonable doubt that an
> aggravating factor exists, R.C.M. 1004(b)(7);
>
> (3)  Unanimous concurrence that aggravating factors
> substantially outweigh mitigating factors, R.C.M.
> 1004(b)(4)(C); and
>
> (4)  Unanimous vote by the members on the death penalty,
> RCM 1006(d)(4)(A). *See Loving v. Hart*, 47 M.J. 438, 442
> (1998).

(continued . . .)

Ultimately, he provided the following instruction:

> You need a required concurrence for any proposed sentence; unanimous for death, three-quarters or 11 votes for a life sentence. If you vote on a proposed sentence or sentences without arriving or reaching the required concurrence, you should repeat the process of discussion, proposal of sentence or sentences, and then voting.

We review de novo an allegation that the military judge erred in instructing the members. *United States v. Behenna*, 71 M.J. 228, 232 (C.A.A.F. 2012). "In regard to form, a military judge has wide discretion in choosing the instructions to give but has a duty to provide an accurate, complete, and intelligible statement of the law." *Id*. Indeed, the military judge's instructions on voting procedure was correct. Under Article 52(b)(1), UCMJ, "No person may be sentenced to suffer death, except by the concurrence of all the members of the court-martial present at the time the vote is taken." Under Article 52(b)(2), UCMJ, "No person may be sentenced to life imprisonment . . . except by the concurrence of three-fourths of the members present at the time the vote is taken." R.C.M. 1006(d)(4)(A) and R.C.M. 1006(d)(4)(B) essentially repeat these statutory provisions, and R.C.M. 1006(d)(5) further requires: "When a mandatory minimum is prescribed under Article 118 the members shall vote on a sentence in accordance with this rule." Under R.C.M. 1006(d)(3)(A):

> All members shall vote on each proposed sentence in its entirety beginning with the least severe and continuing, as necessary, with the next least severe, until a sentence is adopted by the concurrence of the number of members required under subsection (d)(4) of this rule. The process of proposing sentences and voting on them *may be*

---

(. . . continued)

> If at any step along the way there is not a unanimous finding, this eliminates the death penalty as an option.

The defense argued the last quoted sentence establishes that only one vote may be taken on the death penalty. We disagree, for the appellate issue in *Simoy* was the order in which members must vote on proposed sentences, *not the members' authority* to repeat the process in the absence of a required concurrence. We perceive no conflict between *Simoy* and R.C.M. 1006(d)(3)(A).

*repeated* as necessary until a sentence is adopted.
(Emphasis added.).

We conclude the military judge's instructions were correct. We additionally conclude, contrary to appellant's argument and brief, the military judge committed no error in denying the defense's request to respond to the members' question by asking whether they had voted on a sentence.

### VIII – E. THE PANEL PRESIDENT FAILED TO ANNOUNCE THE AGGRAVATING FACTORS THAT IT FOUND TO SUPPORT THE DEATH SENTENCE BEFORE THE COURT ADJOURNED.

At approximately 1450 on 15 April 2010, the members returned from deliberations with their sentence. The military judge reviewed the sentence worksheet, which is Appellate Exhibit 515, and found, "[i]t appears to be in proper form." After returning the worksheet to the members, the military judge asked the panel president to announce the sentence. The president did so, announcing that the members unanimously concurred in sentencing appellant to reduction to E-1, forfeiture of all pay and allowances, a dishonorable discharge, and death. The panel returned the sentencing worksheet to the military judge, who adjourned the court-martial at 1452.

At 1701 on 15 April 2010, the military judge called the court to order; the members were present. The military judge informed the panel that he "neglected to have the President read certain matters that should have been read." He then returned the sentencing worksheet to the panel president, with the following instructions:

> Sir, what actually must be read, in addition to--you don't need to reread the sentence, sir, but I need to have you read:
>
> On page 1, subparagraphs 1 and 2 under (a)(1);
>
> On page 2, subparagraphs 1 and 2 under (a)(2);
>
> On page 3, subparagraphs 1 and 2 under (a)(3); and
>
> On page 4, subparagraph 1.

The panel president then announced the members' unanimous findings "that the following aggravating factor[s] [have] been proven beyond a reasonable doubt:"

> Having been found guilty of the premeditated murder of Mrs. [KE], a violation of the UCMJ, Article 118(1), you have been found guilty in the same case of additional violations of the UCMJ, Article 118(1), in the premeditated murders of Miss [KE] and Miss [EE].
>
> [. . .]
>
> That the premeditated murder of Mrs. [KE], a violation of the UCMJ, Article 118(1), was committed while you were engaged in the commission of rape.
>
> [. . .]
>
> That the premeditated murders of Mrs. [KE], Miss [KE] and Miss [EE], violations of the UCMJ, Article 118(1), were preceded by the intentional infliction of substantial physical harm or prolonged, substantial mental or physical pain and suffering to the victims.
>
> Master Sergeant Timothy B. Hennis, it is my duty as President of this court-martial to inform you that, having considered all the matters in mitigation and extenuation and all the matters in aggravation, this court-martial, in closed-session and upon secret, written ballot, unanimously finds that any extenuating or mitigating circumstances are substantially outweighed by the aggravating circumstances, including the aggravating factors specifically found by the court and listed above.

The president returned the sentencing worksheet to the bailiff, who handed it to the court reporter, and the military judge adjourned the court-martial at 1704.

Under R.C.M. 1004(b)(8), "[i]f death is adjudged, the president shall, in addition to complying with R.C.M. 1007, announce which aggravating factors under subsection (c) of this rule were found by the members." R.C.M. 1007(b) addresses the erroneous announcement of a sentence, providing:

> If the announced sentence is not the one actually determined by the court-martial, the error may be corrected by a new announcement made before the record of trial is authenticated and forwarded to the convening authority. This action shall not constitute reconsideration of the sentence. If the court-martial has been adjourned

> before the error is discovered, the military judge may call
> the court-martial into session to correct the announcement.

Article 60(e)(2), UCMJ, also provides:

> A proceeding in revision may be ordered if there is an
> apparent error or omission in the record or if the record
> shows improper or inconsistent action by a court-martial
> with respect to the findings or sentence that can be
> rectified without material prejudice to the substantial
> rights of the accused.  In no case, however, may a
> proceeding in revision –
>
> [. . .]
>
> (C) increase the severity of some article of the sentence
> unless the sentence prescribed for the offense is
> mandatory.

10 U.S.C. § 860(e)(2) (2006).

We agree with appellant's argument on appeal, to the extent he points out that a "sentence cannot be upwardly corrected after adjournment of the court-martial, even to correct clear errors in announcement of the sentence."  For this argument he cites *United States v. Jones*, 34 M.J. 270, 271-72 (C.M.A. 1992) (citing *United States v. Baker*, 32 M.J. 290 (C.M.A. 1991) and Article 60, UCMJ).  In *Jones*, the court-martial did not announce a sentence to confinement; however, the military judge held a proceeding in revision "approximately two months later" to add the punishment of confinement for six months, explaining "he had intended" to do so in his original announcement.  *Id.* at 271,

In *Baker*, the court-martial did not announce a punitive discharge as part of appellant's sentence.  *Baker*, 32 M.J. at 291.  However, after the panel president revealed that the panel had actually voted to sentence appellant to punitive discharge, the military judge allowed him to announce the omitted portion of the sentence in a subsequent Article 39(a), UCMJ, session.  *Id.*  Noting an inconsistency between R.C.M. 1007(b), which does not prohibit a subsequent announcement from increasing a sentence's severity, and Article 60, UCMJ, which does contain such a prohibition while allowing subsequent announcement of a mandatory sentence, our superior court wrote:

> In our view, [R.C.M.] 1007(b) is inconsistent with Article
> 60(e) to the extent it permits the possibility of command
> influence.  For these reasons, we hold that, after a court-

> martial has announced the sentence and adjourned, the
> sentence cannot be increased upon reassembly, except for
> the reason noted in Article 60(d)(2)(C).

*Id*. at 293.  In the footnote to the first sentence regarding command influence, the court wrote:  "We do not suggest that sentences cannot be corrected, even upward, on the spot.  The mere utterance of the sentence does not effect some magical transformation.  Ordinarily, it will be only after the hearing has terminated that a charge of collective heart-changing can arise."  *Id.* at 293 n.6.

Appellant has made no "charge of collective heart-changing," and we perceive no reasonable basis for such a charge.  The sentencing worksheet remained unchanged after the original announcement.  It reflected the following decisions at *Simoy* "gates" two, three and four:  the signatures of each member, finding each aggravating factor proven; the signatures of each member finding any extenuating or mitigating circumstances substantially outweighed by the aggravating circumstances; and, the signatures of each member, sentencing appellant to death.

We understand the importance of announcing the aggravating factors in a death penalty case.  *United States v. Matthews*, decided before the President promulgated the requirement in the Manual for Courts-Martial, teaches us that for a death penalty to be constitutionally reliable, the following must be present:

> 1.  A Bifurcated Sentencing Procedure Must Follow the
> Finding Of Guilt Of a Potential Capital Offense.
>
> 2.  Specific Aggravating Circumstances Must Be
> Identified To the Sentencing Authority.
>
> 3.  The Sentencing Authority Must Select and Make
> Findings On the Particular Aggravating Circumstances
> Used As a Basis For Imposing the Death Sentence.
>
> 4.  The Defendant Must Have Unrestricted Opportunity To
> Present Mitigating and Extenuating Evidence.
>
> 5.  Mandatory Appellate Review Must Be Required To
> Consider the Propriety Of the Sentence As To the
> Individual Offense and Individual Defendant and To
> Compare the Sentence To Similar Cases Statewide.

16 M.J. 354, 377 (C.M.A. 1983).

Absent the requirement to announce aggravating factors, we would be unable to determine compliance with the third requirement and, therefore, unable to fulfill our duty under the fifth; we would be unable to assess whether the sentencing authority "made 'an *individualized* determination on the basis of the character of the individual and the circumstances of the crime," and whether they have 'adequately differentiate[d] this case in an objective, evenhanded, and substantively rational way' from the other murder cases in which the death penalty was not imposed." *Id.* at 379 (quoting *Zant v. Stephens*, 462 U.S. 862, 879 (1983)).

The procedure involved in announcing the aggravating factors in this case was less than perfect. However, we conclude appellant did receive and continues to receive the benefit of the fundamental protections described in *Matthews*. Considering Article 60, UCMJ, and our superior court's interpretation thereof, we hold the panel president's subsequent announcement of the previously-found aggravating factors in support of its previously-announced death sentence did not increase the severity of the sentence itself.

**IX. BASED ON THE SUPREME COURT'S REASONING IN *RING V. ARIZONA*, 536 U.S. 584 (2002), CONGRESS UNCONSTITUTIONALLY DELEGATED TO THE PRESIDENT THE POWER TO ENACT ELEMENTS OF CAPITAL MURDER, A PURELY LEGISLATIVE FUNCTION.**

Considering the record of trial and matters asserted in the parties' briefs, we resolve this assignment of error against appellant consistent with our superior court's treatment of the substantially identical issue in *United States v. Akbar*, 74 M.J. 364, 404 (C.A.A.F. 2015).

**X. DUE PROCESS REQUIRES THAT THE MEMBERS FIND THAT AGGRAVATING CIRCUMSTANCES OUTWEIGH MITIGATING AND EXTENUATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT BEFORE DECIDING WHETHER THE DEATH PENALTY SHOULD BE IMPOSED.**

Considering the record of trial and matters asserted in the parties' briefs, we conclude this assignment of error merits neither discussion nor relief.

**XI. STANDARDS APPLICABLE TO FEDERAL AND STATE CAPITAL DEFENSE COUNSEL HAVE APPLICABILITY TO COURTS-MARTIAL AS RELEVANT STANDARDS OF CARE.**

Considering the record of trial and matters asserted in the parties' briefs, we resolve this assignment of error against appellant consistent with our superior court's treatment of the substantially identical issue in *Akbar*. *Id*. at 399-400.

**XII. MASTER SERGEANT HENNIS' CAPITAL SENTENCE CANNOT STAND BECAUSE THE MILITARY JUDGE ERRED IN ALLOWING INTO EVIDENCE THE PRIOR TESTIMONY OF SEVERAL WITNESSES, TAKEN FROM AN EARLIER STATE TRIAL IN NORTH CAROLINA, VIOLATING ARTICLE 49(D), UCMJ, WHICH DOES NOT PERMIT DEPOSITIONS TO BE PRESENTED INTO EVIDENCE IN A CAPITAL COURT-MARTIAL.**

Considering the record of trial and matters asserted in the parties' briefs, we conclude this assignment of error merits neither discussion nor relief.

**XIII. THE LACK OF A SYSTEM TO ENSURE CONSISTENT AND EVENHANDED APPLICATION OF THE DEATH PENALTY IN THE MILITARY VIOLATES BOTH MASTER SERGEANT HENNIS' EQUAL PROTECTION RIGHTS AND ARTICLE 36, UCMJ.**

Considering the record of trial and matters asserted in the parties' briefs, we resolve this assignment of error against appellant consistent with our superior court's treatment of a substantially similar issue in *Akbar*. *Id*. at 405-06, 411.

**XIV. MASTER SERGEANT HENNIS WAS SUBSTANTIALLY PREJUDICED BY A LEGALLY INSUFFICIENT PRETRIAL ADVICE, INCORRECT POST-TRIAL RECOMMENDATION AND IN-CORRECT ADDENDUM WHEN THE STAFF JUDGE ADVOCATE RECOMMENDED THAT MSG HENNIS BE TRIED IN AN ACTIVE DUTY STATUS AND RECEIVE ACTIVE DUTY PUNISHMENT WHEN MSG HENNIS COULD ONLY BE TRIED IN A RETIREE STATUS, IF AT ALL. *SEE* 10 U.S.C. § 688 (2001) and Department of Defense Directive 1352.1 (2005).**

Considering our conclusion, *supra*, that appellant was lawfully called to active duty under Article 2(a)(1), UCMJ, this assignment of error merits neither discussion nor relief.

**XV. THE DEATH SENTENCE IN THIS CASE VIOLATES THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND ARTICLE 55, UCMJ, BECAUSE THE MILITARY SYSTEM DOES NOT GUARANTEE A FIXED NUMBER OF MEMBERS.** *See IRVIN V. DOWD*, **366 U.S. 717, 722 (1961).**

**XVI. DISCUSSION OF FINDINGS AND SENTENCING INSTRUCTIONS AND OTHER SUBSTANTIVE ISSUES AT R.C.M. 802 CONFERENCES DENIED MASTER SERGEANT HENNIS' HIS RIGHT TO BE PRESENT AT "EVERY STAGE OF THE TRIAL."**

Appellant has assigned these two errors as headnote pleadings without briefing; they merit neither discussion nor relief.

**XVII. THE ROLE OF THE CONVENING AUTHORITY IN THE MILITARY JUSTICE SYSTEM DENIED MASTER SERGEANT HENNIS' [SIC] A FAIR AND IMPARTIAL TRIAL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND ARTICLE 55, UCMJ, BY ALLOWING THE CONVENING AUTHORITY TO ACT AS A GRAND JURY IN REFERRING CAPITAL CRIMINAL CASES TO TRIAL, PERSONALLY APPOINTING MEMBERS OF HIS CHOICE, RATING THE MEMBERS, HOLDING THE ULTIMATE LAW ENFORCEMENT FUNCTION WITHIN HIS COMMAND, RATING HIS LEGAL ADVISOR, AND ACTING AS THE FIRST LEVEL OF APPEAL, THUS CREATING AN APPEARANCE OF IMPROPRIETY THROUGH A PERCEPTION THAT HE ACTS AS PROSECUTOR, JUDGE, AND JURY.**

Appellant has assigned this error as a headnote pleading without briefing; we resolve it against him consistent with our superior court's treatment of the issue in *United States v. Loving*, 41 M.J. 213, 296-97 (C.A.A.F. 1994).

**XVIII. ARTICLE 18, UCMJ, AND R.C.M. 201(F)(1)(C), WHICH REQUIRE TRIAL BY MEMBERS IN A CAPITAL CASE, VIOLATES THE GUARANTEE OF DUE PROCESS AND A RELIABLE VERDICT UNDER THE FIFTH, SIXTH, AND**

EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Appellant has assigned this error as a headnote pleading without briefing; we resolve it against him consistent with our superior court's treatment of the issue in *Gray*, 51 M.J. at 49.

**XIX. MASTER SERGEANT HENNIS WAS DENIED HIS RIGHT TO A TRIAL BY AN IMPARTIAL JURY COMPOSED OF A FAIR CROSS-SECTION OF THE COMMUNITY IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION. *DUREN V. MISSOURI*, 439 U.S. 357 (1979). *BUT SEE UNITED STATES V. CURTIS*, 44 M.J. 106, 130-33 (C.A.A.F. 1996).**

Appellant has assigned this error as a headnote pleading without briefing; we resolve it against him consistent with our superior court's treatment of the issue in *Gray*, 51 M.J. at 61.

**XX. THE SELECTION OF THE PANEL MEMBERS BY THE CONVENING AUTHORITY IN A CAPITAL CASE DIRECTLY VIOLATES MASTER SERGEANT HENNIS' RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 55, UCMJ, BY IN EFFECT GIVING THE GOVERNMENT UNLIMITED PEREMPTORY CHALLENGE[S].**

Appellant has assigned this error as a headnote pleading without briefing; we resolve it against him consistent with our superior court's treatment of substantially similar issues involving a convening authority's selection of panel members in *United States v. Curtis*, 44 M.J. 106, 132 (C.A.A.F. 1996).

**XXI. THE PRESIDENT EXCEEDED HIS ARTICLE 36 POWERS TO ESTABLISH PROCEDURES FOR COURTS-MARTIAL WHEN HE GRANTED TRIAL COUNSEL A PEREMPTORY CHALLENGE AND THEREBY THE POWER TO NULLIFY THE CONVENING AUTHORITY'S ARTICLE 25(D) AUTHORITY TO DETAIL MEMBERS OF THE COURT.**

**XXII. THE PEREMPTORY CHALLENGE PROCEDURE IN THE MILITARY JUSTICE SYSTEM, WHICH ALLOWS THE GOVERNMENT TO REMOVE ANY ONE MEMBER WITHOUT CAUSE, IS AN UNCONSTITUTIONAL VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION IN CAPITAL CASES, WHERE THE PROSECUTOR IS FREE TO REMOVE A MEMBER WHOSE MORAL BIAS AGAINST THE DEATH PENALTY DOES NOT JUSTIFY A CHALLENGE FOR CAUSE. *BUT SEE UNITED STATES V. CURTIS*, 44 M.J. 106, 131-33 (C.A.A.F. 1996); *UNITED STATES V. LOVING*, 41 M.J. 213, 294-95 (C.A.A.F. 1994).**

Appellant has assigned these two errors as headnote pleadings without briefing; we resolve them against him consistent with our superior court's treatment of substantially similar issues in *Curtis*. *Id*. at 131-33.

**XXIII. THE DESIGNATION OF THE SENIOR MEMBER AS THE PRESIDING OFFICER FOR DELIBERATIONS DENIED MASTER SERGEANT HENNIS A FAIR TRIAL BEFORE IMPARTIAL MEMBERS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 55, UCMJ.**

Appellant has assigned this error as a headnote pleading without briefing; we resolve it against him consistent with our superior court's treatment of a substantially similar issue in *Gray*. 51 M.J. at 57.

**XXIV. THE DENIAL OF THE RIGHT TO POLL THE MEMBERS REGARDING THEIR VERDICT AT EACH STAGE IN THE TRIAL DENIED MASTER SERGEANT HENNIS A FAIR TRIAL BEFORE IMPARTIAL MEMBERS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE 55, UCMJ. *SEE* APP. EX. 50.**

Appellant has assigned this error as a headnote pleading without briefing; we resolve it against him consistent with our superior court's treatment of a substantially similar issue in *Gray*. *Id*. at 60-61.

**XXV. THERE IS NO MEANINGFUL DISTINCTION BETWEEN PREMEDITATED AND UNPREMEDITATED MURDER ALLOWING DIFFERENTIAL TREATMENT AND SENTENCING DISPARITY IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 55, UCMJ. *SEE* APP. EX. XXXIV (DEFENSE MOTION TO DISMISS THE CAPITAL REFERRAL DUE TO ARTICLE 118 OF THE UCMJ BEING UNCONSTITUTIONALLY VAGUE).**

Appellant has assigned this error as a headnote pleading without briefing; we resolve it against him consistent with our superior court's treatment of a substantially similar issue in *Gray*. *Id*. at 56.

**XXVI. MASTER SERGEANT HENNIS WAS DENIED HIS RIGHT UNDER THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION TO A GRAND JURY PRESENTMENT OR INDICTMENT.**

**XXVII. COURT-MARTIAL PROCEDURES DENIED MASTER SERGEANT HENNIS HIS ARTICLE III RIGHT TO A JURY TRIAL. *SOLORIO V. UNITED STATES*, 103 U.S. 435, 453-54 (1987) (MARSHALL J., dissenting). *BUT SEE UNITED STATES V. CURTIS*, 44 M.J. 106, 132 (C.A.A.F. 1996).**

Appellant has assigned these two errors as headnote pleadings without briefing; we resolve them against him consistent with our superior court's treatment of the issues in *Gray*. *Id*. at 48.

**XXVIII. DUE PROCESS REQUIRES THAT TRIAL AND INTERMEDIATE APPELLATE JUDGES IN A MILITARY DEATH PENALTY CASE HAVE THE PROTECTION OF A FIXED TERM OF OFFICE, NOT SUBJECT TO INFLUENCE AND CONTROL BY THE JUDGE ADVOCATE GENERAL OF THE ARMY. *BUT SEE UNITED STATES V. LOVING*, 41 M.J. 213, 295 (C.A.A.F. 1994).**

Appellant has assigned this error as a headnote pleading without briefing; we resolve it against him consistent with our superior court's treatment of a substantially similar issue in *Loving*. 41 M.J at 295.

**XXIX. THE ARMY COURT LACKED JURISDICTION BECAUSE THE JUDGES ARE PRINCIPAL OFFICERS WHOM THE PRESIDENT DID NOT APPOINT AS REQUIRED BY THE APPOINTMENTS CLAUSE OF THE CONSTITUTION.** *SEE* **US CONST., ART. II, § 2.** *BUT SEE UNITED STATES V. GRINDSTAFF*, **45 M.J. 634 (N.M. CT. CRIM. APP. 1997);** *BUT CF. EDMOND V. UNITED STATES*, **115 U.S. 651 (1997).**

Appellant has assigned this error as a headnote pleading without briefing; we resolve it against him consistent with the Supreme Court's treatment of substantially similar issues in *Edmond v. United States*, 520 U.S. 651 (1997) and *Weiss v. United States*, 510 U.S. 163, 167-76 (1994).

**XXX. THIS COURT LACKS THE JURISDICTION AND AUTHORITY TO REVIEW THE CONSTITUTIONALITY OF THE RULES FOR COURTS-MARTIAL AND THE UCMJ BECAUSE THIS COURT IS AN ARTICLE I COURT, NOT AN ARTICLE III COURT WHICH HAS THE POWER OF CHECKING CONGRESS AND THE EXECUTIVE BRANCHES UNDER** *MARBURY V. MADISON*, **5 U.S. (1 CRANCH) 137 (1803).** *SEE ALSO COOPER V. AARON*, **358 U.S. 1 (1958) (THE POWER TO STRIKE DOWN UNCONSTITUTIONAL STATUTES OR EXECUTIVE ORDERS IS THE EXCLUSIVE CHECK OF THE ARTICLE III JUDICIARY).** *BUT SEE LOVING*, **[41 M.J. at] 213, 296 (C.A.A.F. 1994).**

**XXXI. MASTER SERGEANT HENNIS HAS BEEN DENIED EQUAL PROTECTION OF THE LAWS IN VIOLATION OF THE FIFTH AMENDMENT IN THAT ALL CIVILIANS IN THE UNITED STATES ARE AFFORDED THE OPPORTUNITY TO HAVE THEIR CASES REVIEWED BY AN ARTICLE III COURT, BUT MEMBERS OF THE UNITED STATES MILITARY BY VIRTUE OF THEIR STATUS AS SERVICE MEMBERS ARE NOT.** *BUT SEE UNITED STATES V. LOVING*, **41 M.J. 213, 295 (C.A.A.F. 1994).**

Appellant has assigned these two errors as headnote pleadings without briefing; we resolve them against him consistent with our superior court's treatment of substantially similar issues in *Gray*. 51 M.J. at 55.

**XXXII. MASTER SERGEANT HENNIS HAS BEEN DENIED EQUAL PROTECTION OF THE LAW UNDER THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE IAW ARMY REGULATION 15-130, PARA. 3-1(d)(6), HIS APPROVED DEATH SENTENCE RENDERS HIM INELIGIBLE FOR CLEMENCY BY THE ARMY CLEMENCY AND PAROLE BOARD, WHILE ALL OTHER CASES REVIEWED BY THIS COURT ARE ELIGIBLE FOR SUCH CONSIDERATION. *BUT SEE UNITED STATES V. THOMAS*, 43 M.J. 550, 607 (N.M. CT. CRIM. APP. 1995).**

**XXXIII. MASTER SERGEANT HENNIS' DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT BECAUSE THE CAPITAL REFERRAL SYSTEM OPERATES IN AN ARBITRARY AND CAPRICIOUS MANNER. *SEE* APP. EX. XL (DEFENSE MOTION TO SET ASIDE CAPITAL REFERRAL FOR LACK OF STATUTORY GUIDELINES).**

**XXXIV. THE DEATH PENALTY PROVISION OF ARTICLE 118, UCMJ, IS UNCONSTITUTIONAL AS IT RELATES TO TRADITIONAL COMMON LAW CRIMES THAT OCCUR IN THE UNITED STATES. *BUT SEE UNITED STATES V. LOVING*, 41 M.J. 213, 293 (C.A.A.F. 1994). THE COURT RESOLVED THE ISSUE AGAINST PRIVATE LOVING, ADOPTING THE REASONING OF THE DECISION OF THE ARMY COURT OF MILITARY REVIEW. *SEE UNITED STATES V. LOVING*, 34 M.J. 956, 967 (A.C.M.R. 1992). HOWEVER, PRIVATE LOVING'S ARGUMENT BEFORE THE ARMY COURT WAS PREDICATED ON THE TENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND THE NECESSARY AND PROPER CLAUSE. *ID.* MASTER SERGEANT HENNIS' ARGUMENT IS PREDICATED ON THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

**XXXV. THE DEATH SENTENCE IN THIS CASE VIOLATES THE FIFTH AND EIGHTH**

**AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 55, UCMJ, BECAUSE THE CONVENING AUTHORITY HAS NOT DEMONSTRATED HOW THE DEATH PENALTY WOULD ENHANCE GOOD ORDER AND DISCIPLINE IN THE ARMY.**

**XXXVI. THE CAPITAL SENTENCING PROCEDURE IN THE MILITARY IS UNCONSTITUTIONAL BECAUSE THE MILITARY JUDGE DOES NOT HAVE THE POWER TO ADJUST OR SUSPEND A SENTENCE OF DEATH THAT IS IMPROPERLY IMPOSED.**

**XXXVII. DUE TO INHERENT FLAWS IN THE MILITARY JUSTICE SYSTEM, THE DEATH PENALTY VIOLATES THE PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT UNDER ALL CIRCUMSTANCES.**

**XXXVIII. THE DEATH PENALTY CANNOT CONSTITUTIONALLY BE IMPLEMENTED UNDER CURRENT EIGHTH AMENDMENT JURISPRUDENCE. *SEE CALLINS V. COLLINS*, 510 U.S. 114, 1144-1159 (1994) (BLACKMUN, J., dissenting) (*cert. denied*).**

**XXXIX. RULE FOR COURTS-MARTIAL 1209 AND THE MILITARY DEATH PENALTY SYSTEM DENIES DUE PROCESS AND CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT AND IS TANTAMOUNT TO FORESEEABLE, STATE-SPONSORED EXECUTION OF INNOCENT HUMAN BEINGS BECAUSE THERE IS NO EXCEPTION FOR ACTUAL INNOCENCE TO THE FINALITY OF COURTS-MARTIAL REVIEW. *CF. TRIESTMAN V. UNITED STATES*, 124 F.3D 361, 378-79 (2D CIR. 1997).**

Appellant has assigned these eight errors as headnote pleadings without briefing; they merit neither discussion nor relief.

**XL.     THE    MILITARY    JUDGE    ERRED    IN ADMITTING THE GOVERNMENT'S CRIME SCENE PHOTOGRAPHS AND VICTIM FAMILY PHOTOS AS THEY WERE UNDULY PREJUDICIAL TO MASTER SERGEANT    HENNIS'    DUE    PROCESS    RIGHTS UNDER THE FIFTH AND EIGHTH AMENDMENTS. *SEE, E.G.,* APP. EX. 53, PROS. EXS. 149-151.**

Appellant has assigned this error as a headnote pleading without briefing; we resolve it against him consistent with our superior court's treatment of a substantially similar issue in *Akbar.* 74 M.J. at 407 ("[I]t cannot be seriously argued that [the] . . . photographs were admitted only to inflame or shock this court-martial.") (quoting *Gray*, 51 M.J. at 35).

**XLI.     THE   DEATH   SENTENCE   IN   THIS   CASE VIOLATES THE *EX POST FACTO* CLAUSE, THE FIFTH    AND    EIGHTH    AMENDMENTS,    THE SEPARATION    OF    POWERS    DOCTRINE,    THE PREEMPTION    DOCTRINE,    AND    ARTICLE    55, UCMJ, BECAUSE WHEN IT WAS ADJUDGED NEITHER   CONGRESS   NOR   THE   ARMY   HAD SPECIFIED A MEANS OR PLACE OF EXECUTION.**

**XLII. THE ARTICLE 38, UCMJ, REQUIREMENT THAT   CIVILIAN   COUNSEL   SERVE   AS   LEAD COUNSEL    VIOLATED    MASTER    SERGEANT HENNIS' FIFTH AND SIXTH AMENDMENT RIGHTS TO COUNSEL.**

**XLIII. THE DYSFUNCTIONAL ADMINISTRATION OF THE MILITARY'S DEATH PENALTY SYSTEM RESULTS    IN    AN    INORDINATE    AND UNPREDICTABLE PERIOD OF DELAY PRECEDING THE ACTUAL EXECUTION OF THE RANDOM FEW FOR WHOM MAY BE EXECUTED. THIS VIOLATES THE    EIGHTH    AMENDMENT'S    PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT. *SEE JONES V. CHAPPELL*, 2014 U.S. DIST. LEXIS 97254, 1 (C.D. CAL. JULY 16, 2014).**

Appellant has assigned these three errors as headnote pleadings without briefing; they merit neither discussion nor relief.

## PROPORTIONALITY REVIEW

We are required to assess the proportionality of appellant's death sentence. *Akbar*, 74 M.J. at 408; *Gray*, 51 M.J. at 62; *United States v. Curtis*, 33 M.J. 101, 109 (C.M.A. 1991). Under Article 66(c), UCMJ, we conclude the approved sentence is correct in law and fact. Further, under the circumstances of this case, including appellant's rape of one of the murder victims, the vulnerability inherent in the young ages of the other two murder victims, and appellant's mutilation of all three murder victims, we conclude the adjudged and approved death sentence fits the crimes of which he was found guilty. We further find "the sentence is generally proportional to those imposed by other jurisdictions in similar situations." *Curtis*, 33 M.J. at 109. *See Ladd v. State*, 3 S.W.3d 547 (Tex. Crim. App. 1999.); *Stevens v. State*, 806 So. 2d 1031, 1064 (Miss. 2001); *Commonwealth v. Eichinger*, 108 A.3d 821, 849 (Pa. 2014) ("multiple murders and murder of child weigh heavy in aggravation.") (citing *Commonwealth v. Koehler*, 36 A.3d 121, 151-52 (Pa. 2009)).

## CONCLUSION

The findings and sentence are correct in law and fact and are AFFIRMED.

Senior Judge TOZZI, Judge HERRING, and Judge BURTON concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court